THE JOHN AGNEW COMPANY

*v.*

THE BOARD OF EDUCATION OF THE CITY OF PATERSON et al.

[Decided February 13th, 1914.]

1. Under Municipal Improvements Lien act, act April 19th, 1909 (*P. L. 1909 p. 260*), providing that the funds of the contractor, due or to grow due under the contract against which liens have been filed, may be released by giving a bond conditioned for the payment of such sums as may be "decreed to be due from the said contractor," the quoted words do not refer to the chancery suit *in rem* to determine liens, contemplated by another section of the act, and claimants, under liens released by the giving of such a bond, may not assert, in such chancery suit, any claim to the fund.

2. Where, by the Municipal Improvements Lien act, act March 30th, 1892 (*P. L. 1892 p. 369*), before its amendment, all parties who had filed liens were to be made parties in a chancery suit to determine liens, the joinder of claimants covered by a bond, who by provisions of the amending act had no right to the fund, was not improper, as they were proper, though not necessary, parties.

3. Where a bank loans the statutory limit to a company claiming a lien under the Municipal Improvements Lien act, and the company assigns its claim against the fund to the bank as security, the bank is not entitled to claim that the assignment covered further money loaned to individual officers of the company to evade the banking law.

4. An assignment made by a corporation to secure a pre-existing indebtedness, when the assignor is insolvent or in contemplation of insolvency, is void under Corporation act (*2 Comp. Stat. 1910 p. 1638 § 64*) and under United States Bankruptcy act, July 1st, 1898, chapter 541 (*30 Stat. p. 544; U. S. Comp. Stat. 1901 p. 3418*).

5. An oral promise to assign a claim made before insolvency will not avoid a preference, within Corporation act (*2 Comp. Stat. 1910 p. 1638 § 64*) and Bankruptcy act, July 1st, 1898, chapter 541 (*30 Stat. p. 544; U. S. Comp. Stat. 1901 p. 3418*), where the written assignment is made when insolvent.

6. A foreign corporation, doing business in New Jersey, may not give a preference when insolvent, in violation of the laws of New Jersey relating to domestic corporations in Corporation act (*2 Comp. Stat. 1910 p. 1638 § 64*).

7. An assignment of a claim from a construction company *held,* under evidence showing that the assignee, after the assignment, reassigned a portion of his claim to dummies, who filed a petition in bankruptcy

4

against the construction company, to be a preference, void under Corporation act (2 *Comp. Stat. 1910 p. 1638 § 64*) and Bankruptcy act, July 1st, 1898, chapter 541 (*30 Stat. p. 544; U. S. Comp. Stat. 1901 p. 3418*).

8. An assignment, by an insolvent corporation, to a party who has no notice of such insolvency, is good as to so much of the consideration as is paid at the time the assignment is made.

9. The notice prescribed in the Municipal Improvements Lien act, act April 19th, 1909 (*P. L. 1909 p. 260*), is not to be deemed a pleading which must be drawn with technical accuracy, but corresponds with stop-notices filed under the Mechanics' Lien act.

10. A notice under Municipal Improvements Lien act, act April 19th, 1909 (*P. L. 1909 p. 260*), need not set out the exact legal contract under which claimant filed a lien, and a notice is sufficient which recites that the materials were "furnished on orders given day by day and subject to a previous quotation of prices."

11. Under Municipal Improvements Lien act, act April 19th, 1909 (*P. L. 1909 p. 260*), providing that a "claimant may file with the chairman or head of the department * * * and with the financial officer * * * notices," a claimant filing one notice first and one last in point of time is inferior to a claimant filing his notices on both officers before the last notice of the other claimant.

12. Where a foreign construction company, under contract for municipal improvements, is thrown into bankruptcy, from the time of the appointment of an ancillary receiver in New Jersey with authority to take over assets and providing for an injunction against the payment of such assets, no liens can be filed under Municipal Improvements Lien act against the fund due the construction company from the city, even by laborers, who have, by section 9 of the Improvement act, act March 30th, 1892 (*P. L. 1892 p. 372*), a first lien on the fund, regardless of the time when their lien is filed, providing it be filed.

13. Where a city is enjoined from paying the amount due on a contract for the construction of a high school building, of which the city has had the benefit, until the determination of liens filed against the fund, the city is liable for interest on the amount unpaid at a rate conformable to the rate they would pay to borrow the money to pay the amount as was their custom.

14. Under Municipal Improvements Lien act, a complainant in a chancery suit to have liens established is entitled to costs and a counsel fee, if successful, out of the fund.

15. In a chancery suit, under Municipal Improvements Lien act, to determine liens on a fund due a contractor, costs will be charged in favor of successful defendants against defeated adversaries, whose unsuccessful litigation was the sole cause of the costs.

---

On final hearing on bills, answers, replications and proofs taken in open court.

*Mr. William B. Gourley,* for the complainant, the John Agnew Company.

*Mr. Edward F. Merrey* and *Mr. Thomas F. McCran,* for the city of Paterson and the Board of Education of the City of Paterson.

*Mr. Gustav A. Hunziker,* for the defendant Ingalls Stone Company.

*Mr. Munson Force,* for the defendant James Healey.

*Mr. John J. Fallon,* for the defendant First National Bank of Town of Union.

*Mr. William F. Delaney* and *Mr. Noah A. Stancliffe* (of the New York bar), for the defendant Martin S. Payne.

*Mr. David F. Edwards* and *Mr. Edward Ward McMahon* (of the New York bar), for the defendant Frank Miller Lumber Company.

*Mr. William I. Lewis,* for the defendant Joseph Sharpe Construction Company.

. *Mr. Hugh B. Reed,* for the defendant Herringbone Metal Lath Company.

*Mr. William M. Drew,* for the defendant Cortlandt Engineering Company.

*Mr. Gaetano M. Belfatto,* for the defendant F. G. Ebsary.

*Mr. Albert Comstock,* for the defendant Architectural Plastering Company.

*Mr. Frank H. Hall,* for the defendant trustee in bankruptcy of the Glen Engineering Construction Company.

*Mr. John Pomfret,* for thirty-seven workmen's claims for wages.

STEVENSON, V. C.

1. The decree will adjudge that any liens originally acquired by the Ingalls Stone Company and James Healey, by the filing of their respective notices, were released so that they have no participation in the distribution of the fund. Under the statute, as amended in 1909, these parties are covered by a bond securing their entire claims. The provision for the substitution of a bond for the claimant's lien, which was injected into the statute in 1909, like many other provisions of the act, is badly drawn. After a careful study of this amendment, I have reached the conclusion that the words "decreed to be due from said contractor under any such claim" do not refer to the suit *in rem,* which may or may not be brought at a later time, after the bond has been given, covering all claims at that time on file, but to any action in any court of competent jurisdiction in which any of these claimants may sue on their bond, or otherwise, for the recovery of their debts mentioned in the notices of "claim" which they filed. The word "decreed" must not be taken in a technical sense. This statute, borrowed from New York, confuses technical terms of law and of equity. The "claimant" in an equity suit is called the "plaintiff." To allow in this suit *in rem,* instituted in order to effect the distribution of this fund among parties who have liens upon it, any decree establishing the validity and amount of claims which are not liens on the fund at all would, in my judgment, establish a very incongruous and inconvenient practice. If such a decree could be made it would seem that the surety on the bond should be made a party to the suit. No personal decree of any kind is allowable in the suit provided by this peculiar statute. The case of these two claimants from whose liens the funds due and to grow due on the contract have been released, it seems to me, remains precisely the same as if after their bond had been given, which included all liens on the fund which had been created up to that time, no further liens had ever been filed. Can there be any good ground for holding that these claimants after they had lost their liens on the fund and, as a substitute for such liens, had been protected to the full amount of their respective debts by the bond, could have brought any suit in the court of chancery of

New Jersey under this statute, or otherwise, to collect their money or to have the amount due them fixed by a decree? It may be observed that the bond does not merely secure to these claimants the amount which would have been adjudged or decreed due to them from the proceeds of the original contract of the municipality if their liens had not been discharged; the bond secures to them the payment of such sums as should be decreed "due from the said contractor under" their respective claims. The claims might aggregate a much larger sum than any sum which was due or could ever become due to the contractor from the municipality. In such case can there be any question that the remedy of the claimants covered by the bond would be by an action at law to be brought by them or on their behalf, in which the full amount of their claims would be recovered without regard to the amount which they would have recovered on their liens if no bond had been given?

No intimation is made that the joinder of these two claimants, from whose liens the fund in question has been released, was not entirely proper. They may be proper, although not necessary parties. They seem to occupy a position similar to that of encumbrancers who are brought into an ordinary foreclosure suit because their encumbrances stand uncanceled of record, although in fact they have been paid. The mandate of the statute contained in section 7 that "the plaintiff must make all parties who have filed claims * * * parties defendant" applies to the situation of affairs when the statute was enacted in 1892, without any provision for a release upon giving bond.

2. The first lien in point of time claimed upon the fund in this action is that of the First National Bank of the Town of Union, New Jersey, for $15,000 and interest thereon. This lien is claimed under an assignment from the Glen Engineering Construction Company to the said bank, dated September 15th, 1910, delivered on September 16th, 1910. The indebtedness alleged to be secured by this assignment is represented by two notes, one for $10,000 and the other for $5,000. The Glen company exhausted the lending power of the bank available to it under the National Banking act, when it procured the discount by the bank of its note for $10,-000. In this situation of affairs the bank discounted the note of

the officers of the Glen company, all parties understanding that the proceeds of the note would be turned over to that company. The bank now asks this court to countenance what it alleges was an evasion of the National Banking act, and to hold that this independent transaction, to which the Glen company was not a party at all, nevertheless must be deemed to have created a debt from the Glen company to the bank so as to bring the same within the operation of this assignment. All this in the face of the fact that the bank refused to loan the Glen company any amount beyond the $10,000 which had been loaned, because it was not lawful for them to make such a loan, and the bank thereupon scrupulously excluded the Glen company from the new loan and made it, as appears by the books of the bank, strictly a loan to the individual who signed the note. Under no circumstances could this assignment on its face be stretched so as to cover any indebtedness beyond the $10,000 which was legally due from the Glen company to the bank.

There has been no argument in regard to the description in the assignment of the money which was thereby intended to be transferred by way of mortgage to the bank, and I shall not deal with this matter.

My conclusion of law and of fact in regard to the validity of this assignment is that it was made to secure a pre-existing indebtedness when the assignor was insolvent or in contemplation of insolvency, and that therefore it is void under the sixty-fourth section of the Corporation act of New Jersey. I also conclude that this assignment is void under the present United States Bankruptcy act.

It is not the purpose of this memorandum to discuss the evidence at length. Not even all the propositions of fact which I find established by the evidence will be set forth. In regard to the oral promise for an assignment of the contract alleged to have been made by the Glen company to the bank when the loan of $10,000 was made, my conclusion is that the evidence is unsatisfactory and entirely inadequate to establish at the present time that any such definite oral contract ever was made. Assuming, however, that such an oral promise was made in consideration of which the bank made the loan, the law is well

settled and well founded, in reason that no such oral promise can affect the status of the subsequent assignment made in pursuance thereof, as a preferential transfer under our Corporation act or under the Bankrupt act. We have to deal in this case with the character of this assignment made by the Glen company to the bank on September 16th, 1910, to secure a loan made nearly five months prior thereto without the slightest regard to any oral promise from the Glen company to the bank made at the time the loan was effected, and on the strength of which the loan may have been made.

The assignment is also probably void under the New York statute, but I have not deemed it necessary to decide this point, because in my judgment the law of New Jersey controls in this case.

A foreign corporation, under the principle of comity, comes into New Jersey to do business and makes large contracts for the construction of buildings in New Jersey, in which business it acquires property in New Jersey, and also contracts debts. It would be a most extraordinary result, indeed, if when this foreign corporation becomes insolvent it could still transfer its New Jersey assets acquired in its New Jersey business so as to make preferences among its New Jersey creditors, necessarily disadvantageous to some of them, in defiance of the law which prevents New Jersey corporations from doing this thing. Our statute expressly provides that "foreign corporations doing business in this state shall be subject to the provisions of this act so far as the same can be applied to foreign corporations." Section 96. There is not the slightest difficulty in applying the prohibition upon preferences contained in section 64 of the Corporation act to a foreign corporation and its assets, of the character and in the situation presented in this case. If the Glen company had not been put in bankruptcy, the statutory action, based on insolvency, &c., provided for in section 65 of our statute, might have been brought and the receiver appointed in such an action would have taken possession of all the New Jersey assets, including the right to collect this money from the city of Paterson, and would have administered the same precisely as they would have been administered in case the corporation had been created under our New Jersey statute.

3. The next lien in chronological order alleged to be charged upon the fund in question is that of Martin S. Paine for $4,900 and interest. This lien is claimed under two assignments from the Glen company to Mr. Paine, dated December 1st, 1910. These assignments were executed, acknowledged and delivered at the same time, and thereupon Mr. Paine gave his check for $4,900 to the Glen company, the assignors, to meet a payroll about to come due. The status of Mr. Paine's claim depends upon quite a large number of facts, circumstances and conditions, the more important of which it may be convenient to set forth herein without undertaking, however, anything approaching a complete examination and discussion of the evidence.

The leading facts above referred to are as follows:

Mr. Paine holds one share of stock, evidently to qualify him to be a member of the board of directors of the Glen company. The treasurer of the company, Mr. Downey, was his friend, and it appears that through such friendship Mr. Paine was induced to make loans to the company. He took no part in the business of the company, and attended very few of the meetings of its directors. On the 30th of November, 1910, Mr. Paine's loans, made in three amounts during the preceding four months, amounted to $21,000. On the 30th of November, 1910, Mr. Edward Gunnell, as agent for Mr. Paine, procured an assignment from the Glen company of the "retained percentages" on the Paterson contract amounting, approximately, to $42,813.45, to secure the payment of these three sums of money aggregating $21,000 and interest thereon. Whether Mr. Gunnell had previously had these sums, or a portion of them, nominally assigned to him by Mr. Paine does not appear. At this time Mr. Paine employed Mr. Gunnell to examine the books of the Glen company, and this examination was proceeding during the latter part of November or the first part of December.

It is a significant fact that this assignment to Mr. Gunnell expressly recites that it is "subject and subordinate to the rights acquired by said First National Bank of the Town of Union under" its assignment, and directs and empowers the said bank to pay to Mr. Gunnell, or his assigns, out of all moneys which the bank shall collect under its assignment,

"any excess over the amount due to said First National Bank of the Town of Union in accordance with the terms of the said assignment, up to but not in excess of the sum of $21,000 with interest,"

setting forth the three separate loans which aggregate that sum. Notwithstanding this recognition of the validity of the assignment of the bank, counsel for Mr. Paine strenuously argues that the bank's assignment was an unlawful preference and therefore should be declared void in this suit. But the important point to observe is that Mr. Paine's representative and agent who procured this preferential assignment on November 30th, 1910, recognizes that the fund already was charged with the indebtedness due to the bank, and no effort was made to show that the amount of this indebtedness—the amount for which the bank claimed to hold the assignment—was not known to Mr. Gunnell or to Mr. Paine. The Paterson contract, therefore, on December 1st, was already covered with mortgages to secure $36,000, or at least $31,000, within the view of Mr. Paine or his agents whose knowledge is imputable to him.

On December 1st, 1910, the directors of the Glen company, Mr. Alford, the president, Mr. Downey, the treasurer, and Mr. Paine met at the office of Mr. Hardy, who was Mr. Paine's attorney. There can be no doubt, I think, from the testimony that Mr. Paine's accountant had in part at least examined the books of the Glen company and discovered that its financial condition was perilous, and that Mr. Paine had received this partial report. Mr. Alford testified (at *p. 517*) that Mr. Paine's attorney, Mr. Hardy, told him, at the interview or meeting of directors when the assignment was arranged for, that from what he had learned from the examination of the books, presumably by Mr. Gunnell, it appeared that things "looked rather bad," and Mr. Hardy further stated that to lend the required $4,900 "might be just losing that much more." Mr. Paine, on cross-examination, declined to testify whether or not Mr. Hardy had made those statements to him as Mr. Alford stated. He said that he did not "recall." It may be noted that neither Hardy nor Mr. Gunnell, nor any of the other agents of Mr. Paine who figured in this case, were placed upon the stand to give their testimony. Mr. Paine appears to be a business man of somewhat

large affairs, whose connection with the Glen company was very slight. He operated in getting these assignments through agents who are not brought as witnesses to tell what they learned and what they knew while acting for their principal.

The arrangement made by these gentlemen on December 1st, 1910, and which was immediately carried out, was that Mr. Paine should advance the required payroll ($4,900), and thereupon the company would give to him the two assignments (*Exhibits C 8* and *C 9*). Both of these assignments, as well as the assignment *C 7*, made to Mr. Gunnell the day before (November 30th), appear to have been drawn by Mr. Hardy or in his office. All have the same backs upon which Mr. Hardy's business card is printed. By one of the assignments of December 1st, 1910 (*Exhibit C 9*), all moneys due or to become due to the Glen company upon the Paterson contract were assigned

"as security to said Paine for moneys advanced by him to and for the benefit of the Glen Engineering Construction Company, and for such moneys as may hereafter be advanced to or for the benefit of said company."

It will be observed that this assignment on its face did not undertake to secure specifically the new loan of $4,900 contemporaneously made to the company. It covered generally all present and future indebtedness, and for a reason which is not disclosed in the evidence, but may be surmised, it ignored the assignment to the bank.

The other assignment (*C 8*) executed December 1st, 1910, is to the same effect as its companion, securing "moneys advanced" by Mr. Paine, and "such moneys as may hereafter be advanced." This second assignment, however, covers all moneys due and to become due to the assignor on its three contracts in New Jersey —the Paterson contract, the Newark contract and the Staten Island contract. Mr. Paine admits in his testimony that he knew that these were the three contracts that the company was performing in the year 1910, and evades the question whether he knew that they were its only contracts (at *p. 471*). Mr. Alford testifies that when the assignment was first suggested, he (Alford) asked Mr. Hardy "what value it would be," and there-

upon Mr. Hardy stated "he would take it for what it was worth," or words to that effect. This was said in the presence of Mr. Paine, and yet Mr. Paine is silent in his testimony in regard to the matter, and Mr. Hardy is not put upon the stand.

Mr. Paine, having procured assignments covering practically all the assets of the company on November 30th and December 1st, caused his three notes, which constituted his claim of $21,-000, to be assigned for no consideration, to three agents or dummies of his who thereupon used the same to qualify them to file a petition in bankruptcy on December 9th, 1910, against the Glen company.

I have thought it worth while to state some of the facts relating to these Paine assignments in their chronological order, but without further discussion of the evidence, I may state my conclusion of fact that all these assignments were void under section 64 of the Corporation act of New Jersey, and under the provisions of the Bankrupt act prohibiting preferences.

Counsel for Mr. Paine, with great astuteness, undertook to present this case as if the transaction between Mr. Paine and the Glen company consisted solely of his making a loan on December 1st of $4,900 to meet a payroll, and accepting for such loan the assignments which he held. The transaction, in my judgment, will not bear that character, nor do I think that Mr. Paine's situation in procuring an assignment of practically all the remaining assets of this insolvent company to secure $25,-900 of indebtedness is strengthened by the fact that $4,900 of this sum was advanced when the assignments were made. I find that Mr. Paine stands charged with notice that the assignments which he received were unlawful attempts to prefer him to the extent of $21,000 of pre-existing indebtedness. It is true, as decided in *Frost* v. *Barnert, 56 N. J. Eq. 290,* that an assignment by an insolvent corporation to a party who has no notice of such insolvency, may be held good as to so much of the consideration as was paid at the time the assignment was made, while it stands void under our statute as to so much of the consideration as consisted of a pre-existing debt. To hold that Mr. Paine personally and through agents who bound him in the matter had no notice that these assignments were made to him when

the Glen company was insolvent, or in contemplation of insolvency, as preferences over other creditors, would, in my opinion, involve a method of dealing with evidence and human nature contrary to sound rules of law and of common sense.

4. The lien notice of the complainant, John Agnew Company, for $11,933.29, filed November 28th, 1910, which stands first in point of filing, I find substantially complies with the requirements of the statute, and the amount of the claim stands as a first lien on the fund.

The notice prescribed by the statute is not to be deemed a pleading or a paper which must be drawn with technical accuracy, or according to technical rules. It corresponds with the stop-notices filed under the Mechanics' Lien act. The sufficiency of a notice is mainly to be determined by a consideration of the objects of the notice. The question is, does this paper filed in these offices convey the information which the statute intends all parties interested shall have. Measured by this test the notice seems to me to be ample. The argument *contra* is purely technical. In view of the doubt which has been expressed in regard to whether the notice of lien under the act must contain a statement of the terms, &c., of the claimant's contract, or of the contract of the contractor with the municipality, the notice of the complainant in this case seems to have been drawn so as to describe the terms, &c., of both contracts. No argument has been made that the notice is defective in respect of the original contract between the board of education and the Glen company. Perhaps counsel have assumed, what seems to me to be the correct view, that the statute intends that the notice shall describe the terms, &c., of the claimant's contract. Accepting this view for the further consideration of this case, I think there are grounds for holding that the statute did not intend to require a claimant, perhaps a business man acting for himself, when drawing a notice of lien, to spell out accurately the exact legal contract into which he entered by means of letters and conversations and under which his material was furnished. I think that the contention on behalf of the complainant is correct that the letters which passed between the complainant and the Glen company, and in pursuance of which the material was furnished,

were mere quotations of prices. The notice, in my judgment, correctly states that the materials were "furnished on orders given day by day, and subject to a previous quotation of prices."

In construing a statute as clumsily and unscientifically drawn as this Municipal Improvements Lien act, and its amendments, it is oftentimes impossible for the judicial mind to reach a satisfactory interpretation of phraseology employed by untrained minds. The difficulty naturally is greater when the statute is bodily carried from one state, where it belongs and fits into a judicial system, to another state where it does not belong, or to whose judicial system its adjustment is not easily made. Violent wrenches oftentimes are necessary in such cases. Rather than to adopt a construction of this Municipal Improvements Lien act, which would render a notice of lien like that of the John Agnew Company inoperative, because of a purely technical objection like the one made in this case, the view might be adopted that the phraseology of the statute, "a statement of the terms, time given, condition of his contract," refers only to cases where the labor has been done or the materials have been furnished in pursuance of a written contract, or at least a definite and complete oral contract altogether different from the implied contracts under which labor and materials are generally furnished, which implied contracts embrace and adopt any definite matters which may have been agreed upon by letters, or otherwise, such as a scale of prices.

The claim of the complainant will stand as proved as a first lien on the fund.

5. The next lien is that of Frank Miller Lumber Company for $10,955.14, filed December 9th, 1910. The important questions argued on behalf of this claimant related to the validity of the respective assignments to the First National Bank of the Town of Union and Martin S. Paine, which have already been disposed of. No objection is made to the form of the notices or the amount of the claim as proved. The claim will therefore take its place next to that of the complainant.

6. The next claim in order is that of the Joseph Sharp Construction Company for $3,037, filed on December 10th, 1910, at ten-fifty-five A. M. with the comptroller and at eleven-ten

A. M. with the board of education. No attack has been made upon this lien and the amount thereof will be allowed as proved.

7. Next comes the claim of the Herringbone Metal Lath Company for $761.25, filed December 10th, 1910, at eight-fifteen P. M. with the comptroller and at nine-thirty P. M. with the board of education.

8. We find next two claimants who have a dispute in regard to priority *inter sese.* The Cortlandt Engineering Company filed a claim of $2,537 on December 12th, 1910, at ten-eight A. M. with the board of education and at ten-fifteen A. M. with the comptroller.

Fred G. Ebsary filed a claim for $900 on December 10th, 1910, at twelve-four P. M. with the comptroller, and on December 12th, 1910, at one-thirty-five P. M. with the board of education. It thus appears that Mr. Ebsary filed his notice with the comptroller before any notice had been filed by the Cortlandt Engineering Company in either office, but that the Cortlandt company completed its lien by filing its notice in both offices before Mr. Ebsary had so completed his lien. Counsel for Mr. Ebsary argues that it is the filing of notice of lien with the comptroller which fastens the lien upon the fund. I am entirely unable to adopt that view. When the statute imposes two conditions—prescribes the doing of two things in order that a lien may be created, both the conditions must be performed; both the things must be done. The Lien act which we have under consideration provides that any "Claimant may file with the chairman or head of the department * * * and with the financial officer of said * * * *notices* setting forth certain facts." It is the filing of the *notices* which created the lien, and until the notices are filed no lien exists. The Cortlandt Engineering Company will therefore take the fifth place in the line of encumbrancers, and Mr. Ebsary will stand sixth.

9. The liens of the Architectural Plastering Company for $1,680, and the American Lumber Company for $242.90, take the seventh and eighth places in order, respectively, there being no contest over the notices which created these liens or the amounts secured thereby.

10. The allowance of the eight liens in the order above set forth will exhaust the fund ($29,639.31) in the hands of the municipality, and I am not aware that any questions in respect of validity or priority arise with respect to the long list of claims filed subsequently to these eight. If the eight claims have correctly been established as valid, these subsequent lienors have no interest in the cause.

11. On December 10th, 1912, an involuntary petition in bankruptcy was filed in New York against the Glen company, and on the same day a receiver was appointed by that court.

On December 12th, 1910, at four P. M., an order was filed in the clerk's office of the United States district court for the district of New Jersey, appointing an ancillary receiver of the bankrupt estate, and investing such receiver with authority to take possession of the assets of the bankrupt in New Jersey, and enjoining all persons from interfering, &c., &c.

On December 13th, 1910, the ancillary receiver was duly qualified and presumably took such possession of the bankrupt estate in New Jersey as he was able to obtain. The bankruptcy receiver and the bankruptcy trustee are defendants in this suit, and on behalf of the trustee elaborate argument has been made against the validity of the two assignments to the bank and to Paine, respectively, and to the lien of John Agnew Company. It was conceded that the receiver in bankruptcy and the trustee took the fund in question subject to all valid liens acquired by filing notices under our statute prior to the entry of the order appointing the ancillary receiver by the New Jersey federal court. No argument, except the one on behalf of the labor claims hereinafter considered, was made to sustain the validity of lien notices filed as prescribed by our law after this order appointing the ancillary receiver was entered. I have, however, made a careful examination of the authorities controlling this question as to the exact date after which no liens could be acquired upon this fund, by filing notices under the New Jersey statute, and it must be conceded that the effect of orders appointing receivers is a subject about which there has been a very wide difference of judicial opinion. We are not, however, dealing with the case of an ordinary receiver appointed by a court of

equity under its general equity powers. The cases in different jurisdictions differ as to whether the estate of the defendant is put *in custodia legis*, when the order for the receivership is made, or when the receiver has qualified, or when the receiver has actually taken possession of the land or goods which he is appointed to receive. The question, before the court is less difficult because it involves the receivership of the estate of a bankrupt under the United States Bankrupt law. Here, again, we find inconsistent views. There is some authority for the proposition, which counsel for the trustee in this case, however, does not undertake to sustain, that the assets of the bankrupt are put *in custodia legis*, practically when the petition is filed so as to prevent the acquisition of liens. A *dictum* of Chief-Justice Fuller, which has been to some extent discredited, is largely responsible for this view. *Mueller* v. *Nugent, infra.*

My conclusion is that an order of the bankrupt court appointing a general receiver of the entire bankrupt estate, directing the delivery of such estate to him as far as possible by the bankrupt, and enjoining all other persons from transferring or otherwise interfering with the property, assets and effects of the bankrupt, &c., effects a sequestration of the bankrupt's estate to such extent as to prevent the acquisition of any new lien. The creation of such a receivership in bankruptcy may be a very serious affair, and bankrupt courts wisely exercise caution in regard to the matter. There is a wide difference between the status of the alleged bankrupt's estate in its relation to himself and third parties, when merely a petition has been filed against him, and the status of that estate when the bankrupt court has appointed a receiver in order to strip the alleged bankrupt of all his assets and put them into the possession of such receiver. I think, therefore, that the proposition advanced by counsel for the trustee in bankruptcy that this receivership order prevented the creation of all liens by notice under our statute after December 12th, 1910, at four P. M., is sound law, so that if either by the decree of this court or by the decree of the court of errors and appeals, the lien of the John Agnew Company and the assignment to the First National Bank of the Town of Union should be declared void, a substantial sum would pass to the trustee in

bankruptcy, to the exclusion of the long list of lienors whose notices were filed after the order appointing the receiver was entered.

The following are some of the authorities which will exhibit the difference of judicial opinion in regard to the time when an order of a court of equity appointing a receiver, places the property of which the receiver is directed to take possession, *in custodia legis;* and also the views which have been entertained or enforced by the United States bankrupt courts in regard to the corresponding effect of an order appointing a receiver of the entire bankrupt estate: *1 Pom. Rem.* §§ *158, 159,* with notes and cases cited; *High Rec.* (*4th ed., 1910*) § *52; 23 Am. & Eng. Encycl. L. 1095; Edwards* v. *Edwards, 1 Ch. Div. 454; S. C. on appeal, 2 Ch. Div. 291; Ex parte Evans, 13 Ch. Div. 252; In re Jensen Company, 128 N. Y. 550, 553; L. Love. Bk. § 30; Ibid. 106; Frasier* v. *Southern Loan, &c., Co., 99 Fed. Rep. 707, 713, 714; In re Laplume, &c., Co., 145 Fed. Rep. 1013; Horn* v. *Pere Marquette R. Co.; 151 Fed. Rep. 626, 633; In re Alton Manufacturing Co., 158 Fed. Rep. 367; Mueller* v. *Nugent, 184 U. S. 1; 46 L. Ed. 405, 411; York Manufacturing Co.* v. *Cassell, 201 U. S. 352; 50 L. Ed. 785.*

12. Large numbers of claims for wages were filed under our statute on different dates, from December 17th, 1910, to February 4th, 1911. These claims, of course, do not get the benefit of the amendment of our Municipal Improvements Lien act passed in 1911 (*P. L. 1911 p. 777*), giving such claims priority to assignments, but they do have the full benefit of section 9 of the act which gives them priority to liens for materials effected by notice. If, therefore, no bankruptcy receivership had intervened, these liens for wages would have been created, and would have been entitled to the priority which the statute gives them. I think, however, that no liens were effected by the filing of these notices by the laborers, who are the claimants, because the subject-matter of the lien (the fund) was *in custodia legis* and under the control of the bankrupt court, and therefore the filing of the notices was entirely inoperative. This is not the case which has frequently puzzled the courts where A has a lien prior to B, and B has a lien prior to C, and C has a lien prior to A.

The laborers in this case never secured any lien. They had the power to acquire liens only while the fund was subject to the creation of liens under the statute. A number of causes may intervene which will prevent a claimant from obtaining a lien which if once obtained would be prior to other existing liens. If, before these notices for wages were filed, the prior liens were all paid or discharged by bond, and the entire fund due and which could become due on the contract was paid to the contractor, the subsequent notices filed for wages would establish no lien. It must at all times be borne in mind that it is now settled that neither laborers nor materialmen have any inchoate lien dating from the time when the materials were furnished, or the labor performed, or from the time when payment for such materials or labor became due. The lien is created only by the filing of the notices and takes effect from the completion of such filing in the two offices named.

The argument on behalf of the liens for wages is made that the Agnew and Miller notices, assuming that these notices, or either of them, created a valid lien, prevented the portion of the fund applicable to the satisfaction of such lien from falling into the hands of the court of bankruptcy, and left such portion beyond the custody of the bankrupt court, and so subject to the labor liens which were subsequently filed. This argument is ingenious, but I do not think that it is sound. The lien created by the effectual filing of notices under the statute, whether for materials or labor, attaches to the whole fund. If the bankruptcy receivership had not intervened, the Agnew and Miller notices would rest upon the whole fund, one being superimposed upon the other, and the labor liens, if created thereafter, would under the statute cover the whole fund underneath both the Agnew and the Miller claims. The effect of section 9 of the statute is to give the laborers the first lien on the fund without regard to the time when their notices may have been filed, provided such notices are filed so as to create any liens whatever. According to the theory, which I think prevails in the federal courts, which have the final determination of this question, the order appointing the bankruptcy receiver placed the whole fund *in custodia legis,* notwithstanding the fact that the trustee in

bankruptcy has come into this court for the determination by this court of the validity and extent of the liens upon the fund which was part of the bankrupt estate, and notwithstanding the adjudication by this court that the trustee takes nothing because the liens which are established by the decree of this court exhaust the fund.

The result is that the laborers must be referred to the bankrupt court for such remedy as they may there have.

13. A decree in accordance with this memorandum may be settled on notice, and upon such settlement all questions relating to costs, and also any other questions arising in this complex litigation not covered by this memorandum, may be disposed of.

Notice of settlement of the decree having been given, further argument was had, and thereupon the vice-chancellor furnished to counsel the following supplementary opinion:

The questions relating to the charge and allowance of interest in this case are difficult. It is well said, in *16 Am. & Eng. Encycl. L. 922*, that "there is no subject in the law with reference to which there is greater conflict and confusion in the cases than that of interest." Unless a case be found which is a conclusive authority establishing a precedent, the safest way for a court of law or equity is to decide all questions pertaining to interest according to the plainest and simplest considerations of justice and fair dealing. I do not think that there is any case in New Jersey which controls any of the points relating to interest, to be adjudicated in this case. Perhaps the most helpful judicial deliverances for present purposes are to be found in the opinions of Chancellor Magie, then Mr. Justice Magie, in *Board of Freeholders* v. *Veghte, 7 N. J. L. J. 145*, and Chief-Justice Ewing in the old case of *LeBranthwait* v. *Halsey, 9 N. J. Law 4*. It should be borne in mind that the whole tendency of courts of law and courts of equity for a considerable period of time, has been to break away from hard and fast rules and charge and allow interest in accordance with principles of equity, in order to accomplish justice in each particular case. In deciding these questions of interest in this case which came up on the settlement of the decree, I am more inclined to take

the course indicated because two of the parties whose interests are large in this litigation have positively announced their intention to appeal. My adjudication now to be made, as well as the adjudications which have been already made in this cause, will therefore be reviewed by our court of last resort.

1. My conclusion is that the city of Paterson justly should be charged four per cent. interest on the fund from the date about which there is no dispute. The city had this great and valuable public building—the High School building—in its possession, and enjoyed its use during the period covered by this litigation. It is true the payment of the money was stopped by an injunction, but the case is not like that with which Chief-Justice Ewing had to deal, because it appears from the statement in open court, of the city counsel, and the fact is notorious, that the city of Paterson did not retain this money in its treasury. The city, as counsel stated, expected to borrow the money whenever it was called upon to make payments unless the time for such payment happened to come when the city was in funds. The city borrows money at four per cent. in anticipation of its taxes, and then repays the money so borrowed when the taxes come in. For all moneys on deposit in the banks the city receives two per cent. No evidence was offered to show during what periods the city has been paying four per cent. or receiving two per cent. It is true that the city has not received this money from the parties or from any persons for their use. The injunction simply stopped the city from paying its own money, and, ordinarily, as appears from the *LeBranthwait Case,* no interest would be chargeable. But the city has profited by this injunction, in my judgment, to the extent of four per cent. at least, excepting during brief periods the extent of which has not been the subject of evidence. Perhaps it would be more accurate to say that the city has had the use of this school building in which these moneys in litigation belonging to these claimants have been expended. It has enjoyed the property into which the claimants have put their money, and the value of such enjoyment certainly can safely be held to include four per cent. interest on the money which the city has not been required to pay. If the city had seen fit to borrow this money at four per cent. and pay it into

court, it might easily have taken that course, and notwithstanding what Chief-Justice Ewing says, I think that the ability of the city thus to discharge itself for the interest is a matter to be taken into consideration.

The gist of the topic under discussion can perhaps be summed up best in the proposition that the city of Paterson, during all this period, has had the use of $29,696.31 worth of this High School building, and this property in fact belonged to these claimants in the sense of having been created by their contributions of labor and materials, while the city has not lost the use of a dollar of its money. I cannot distinguish between the use by the city of a fund belonging to these claimants out of which a just claim for interest would arise, and the use of this property into which the money of the claimants has gone. To give the city the free use of the school building while the claimants lose all interest on their money, possibly may be supported by a technical line of reasoning based on ancient and conflicting authorities, but, in my judgment, to permit this to be done, would be inconsistent with the broad principles of justice which at the start I stated would be controlling in this case.

2. Each claim which has been allowed will have four per cent. per annum added. If the city should be obliged to pay five per cent., or the so-called legal rate six per cent. interest, all the claims in like manner would be allowed five per cent. or six per cent. I do not think that it would be just to compel the city of Paterson to pay six per cent. interest when it has been able at all times to borrow at four per cent. Nor do I think that the claimants are entitled to greater interest than that which is charged against the city. One or more of the large claimants offered in open court to waive all claim for interest, but no agreement was reached on that subject. It is notorious that money has been worth only four or five per cent. in the way of interest. What the money of these materialmen and contractors might have been worth to them in their business of course is a matter not to be considered.

3. The complainant will be allowed costs and a counsel fee of $200 out of the fund.

4. The costs and reasonable counsel fees of the defendants who, according to the decree of this court, are successful in their struggle over the fund, will be charged against their defeated adversaries. These costs, expenses of litigation, rendered necessary by the contest to establish claims of defendants, upon the fund which this court has rejected, should not be allowed to deplete the fund so as to cut off or diminish the amount which any claimant would have received if the defeated contestants had not prosecuted their unsuccessful litigation. A large part of the testimony in this case, I think the greater part of it, was taken in the contest which the two assignees made to establish claims which, according to the decree of this court, are without legal foundation. I am unable to discover any ground on which it could be deemed just either to deny the successful defendants their costs, including reasonable counsel fees, in accordance with the present practice of the court, or to permit this substantial amount of money to be taken out of the fund instead of from the parties whose unsuccessful litigation was the sole cause of the outlay.

5. I do not find that the stenographer's bill was made the subject of discussion. There is an amount still due. This item can be cared for in a variety of ways. The stenographer's entire bill is a part of the expense of taking the testimony, and an apportionment of this expense must be made so as to determine how much shall be charged against the unsuccessful defendants.

6. I think that the foregoing covers the various points which were raised and discussed on the settlement of the decree. A new draft may be made and submitted to me as soon as convenient for counsel to meet. I can attend to the matter at Jersey City at ten A. M., on October 28th, or on October 30th. Counsel may also appear next Monday, October 27th, but that is a motion day, and it is impossible to say when during the day the matter can properly and conveniently be taken up. My intention is to have the decree actually put in final form while counsel are together, and I know of no reason why it should not be then and there advised. Subject to arrangements of counsel, I will appoint the final settlement of the decree for October 30th.