This is an appeal from three decrees or orders of the Essex County Orphans Court, namely, an order disallowing exceptions to the report and account of Gertrude Mentz, as executrix of the will of Michael Winter, deceased; an order fixing the compensation of the master who heard the exceptions; and a decree of insolvency, all dated June 17th, 1941. In January, 1933, the executrix petitioned the court to decree that the estate was insolvent. The following month, she filed a report of claims totaling $42,674, and an account of the estate which showed assets of $10,193 and expenses paid of $1,477. The appellants, Joseph M. Mentz and his wife Ann Mentz, together with one Benjamin Solovay, filed joint exceptions to the report of claims and account. The Orphans *Page 247 
Court reserved action on one exception, sustained one in part and disallowed the others.
The testator, Michael Winter, born in Germany, became an American citizen in 1880, spent a good deal of time in Germany, and had a residence at Stuttgart. One of his daughters married Markus Stehle of that city. The last few years of his life, Winter made his home in Stuttgart and there he remarried and eventually died, June 22d 1929. His principal creditor, his sister-in-law, Mrs. Mary Winter, who was a resident of East Orange, New Jersey, promptly engaged lawyers of Stuttgart, on whose application the court in Munich took jurisdiction of the estate in August, 1929. The assets were administered by the Public Administrator, who made his final accounting July 16th, 1932. The second, third and fourth exceptions relate to the estate in Germany.
Letters testamentary have no extraterritorial force and confer no authority on the executor to administer on property outside of the state of his appointment. While I am not sure whether Winter at the time of his death, was domiciled in New Jersey or in Germany, I will assume in favor of appellants that the respondent executrix is his domiciliary representative and the Public Administrator in Stuttgart was ancillary. Immediately upon the appointment and qualification of the latter, he became vested with title to all the assets belonging to the decedent within the jurisdiction of his appointment. 34 C.J.S. 1232 and 1242.Lewis v. Grognard, 17 N.J. Eq. 425. The executrix is not accountable for the German assets and so these exceptions were properly overruled.
The eighth exception complains of the failure of the executrix to charge herself with a cause or causes of action against Esmond P. O'Brien and others.
Under date of March 25th, 1920, Winter entered into a contract with "The Sugola Company of America, a New York trust estate." It was signed:
"Sugola Company of America, by
 ESMOND P. O'BRIEN Trustees H.E. BROWN JOHN T. HOLMES" *Page 248 
The appellants assert that O'Brien, Brown and Holmes, as well as George B. Russell and John H. Sears, were partners doing business under the name of Sugola Company of America, and this contention is the basis of the exception. The American company, as I will call the Sugola Company of America, and Winter each agreed to subscribe for $100,000 of the preferred stock of a new corporation to be organized under the title, Sugola Company of New Jersey, and to pay for the same at the call of the directors.
Under date of August 2d 1920, at Boston, Massachusetts, O'Brien and the other four men named, executed a "Declaration of trust establishing the Sugola Company of America." It is in the general form commonly used for a Massachusetts business trust. Paragraph 9 purports to exempt the trustees and each of them from personal liability upon promissory notes and other contracts executed in connection with the trust. It will be observed that this instrument was not executed until several months after the contract with Winter, but it recites that it is intended as a substitute for a declaration of trust executed by O'Brien, Holmes and Brown on February 7th, 1920.
Early in 1921, the New Jersey company called for a 25 per cent. payment on subscriptions to its preferred stock. Winter paid the call but the American company, in lieu of payment, gave to the New Jersey company its promissory note for $25,000. The note was signed:
 "Sugola Company of America by GEORGE B. RUSSELL, President."
(The trust declaration authorized the trustees to designate one of themselves as president.) The note endorsed on behalf of the New Jersey company by Michael Winter, as president, and by his son Frank Winter, as treasurer, was discounted at the Second National Bank of Orange. When it came due, it was not paid by the maker, or so the appellants allege, and instead it was bought by Michael Winter with his own funds and is still unpaid. The enterprise on which the parties had *Page 249 
embarked was unsuccessful. Neither the American company nor the New Jersey company continued in business for more than a couple of years.
On May 10th, 1927, in the United States District Court for the Southern District of New York, Winter instituted suit against the five alleged partners for $50,000. Counts are based on the promissory note; on the allegation that Winter put up his money in reliance upon the defendants' false representation that the American company was financially able to pay the note; and on the allegation of damages suffered by the plaintiff through the failure of the defendants to meet the call of $25,000 on their subscription for the stock of the New Jersey company. The defendants pleaded a general denial. Mr. Winter died before the suit came to trial. His executrix decided not to press the suit and so it was dismissed in December, 1930, for lack of prosecution. Appellants seek to surcharge the executrix with the value of the cause of action.
In order to surcharge the executrix, it must appear that her cause of action against O'Brien and his associates was an asset of real value and that a reasonable person, viewing the situation in 1930, and using ordinary care, would have continued the prosecution and not have abandoned the claim. If the claim was worthless, nothing has been lost. Even if the claim was valuable, the executrix cannot be surcharged, provided she acted with the utmost good faith, and with ordinary care and diligence. Smith
v. Jones, 89 N.J. Eq. 502; In re Leonard, 107 N.J. Eq. 235.
The contract of March 25th, 1920, was made, as I have pointed out, several months prior to the declaration of trust which was executed in Massachusetts. It follows that liability on the contract is unaffected by the declaration. The contract does not describe O'Brien, Brown and Holmes as partners but as trustees, and it designates the Sugola Company of America as a New York trust estate and not as a partnership. The appellants had the burden of proving a partnership. This, they did not even attempt to do. So I must conclude that O'Brien, Brown and Holmes were what they held themselves *Page 250 
out to be, namely, trustees, and that their personal responsibility for a breach of the contract is determined by rules applicable to trustees.
The promissory note for $25,000 was made after the declaration of trust. Appellants showed that O'Brien and his four colleagues were not only the "trustees" or "managing partners" but owned shares in the estate and so were in a position to participate in any profits. Whether the declaration of trust established a valid trust or a partnership depends upon the terms of the instrument. Persons associating themselves together to carry on business for their mutual profit create a partnership though the legal title to the firm property is vested in one of them or in a third person as trustee, where the associates, though called cestuisque trust, are the principals and control the property and the business operations, and the trustee is their agent bound to obey their instructions. But where there is no association among the beneficiaries and the trustee has, besides legal title, the sole power to manage the property, we have a true trust and not a partnership. Crocker v. Nalley, 249 U.S. 223; 39 S.Ct. 270;Gutelius v. Stanbon, 39 Fed. Rep. 2d 621; Betts v.Hackathorn (Ark.), 252 S.W. Rep. 602; 31 A.L.R. 847;Goldwater v. Oltman (Cal.), 292 Pac. Rep. 624;71 A.L.R. 871; Schuman-Heink v. Folsom (Ill.), 159 N.E. Rep. 250;Williams v. Milton (Mass.), 102 N.E. Rep. 355; Brown v.Bedell (N.Y.), 188 N.E. Rep. 641; Narragansett, c., Co. v.Burnham (R.I.), 154 Atl. Rep. 909. Mr. Justice Depue's careful discussion of partnership in Wild v. Davenport,48 N.J. Law 129, supports these rules in principle. The declaration of trust of August 2d 1920, reserves to the trustees absolute power over the estate, and the business, which are the subject of the declaration. They are authorized to appoint their own successors. There is no provision for meetings of the beneficiaries. They have no authority whatever except in one respect. Two-thirds in interest of the beneficiaries may alter or amend the declaration of trust. "A certificate reciting such alteration or amendment signed by said requisite number of beneficiaries, shall be addressed and delivered to *Page 251 
the trustees who shall embody the same in a supplemental declaration of trust which said trustees shall sign." While this power of the beneficiaries enables them to take over control and so points toward a partnership, it is not enough, standing alone, to balance the provisions of the declaration which indicate a trust. So far as the proofs presented in the Orphans Court go, O'Brien and his associates were trustees. The appellants do not suggest that the trustees, entering into these contracts, exceeded their powers; or that the trust assets did no become liable for a breach.
Personal liability of Russell on the promissory note is affected by the Uniform Negotiable Instrument Law, R.S. 7:2-20, which exempts from liability one who signs in a representative capacity, provided he is duly authorized and the instrument discloses his principal. Within the meaning of the statute, a trustee is a representative and the trust estate is his principal. American Trust Co. v. Canevin, 107 C.C.A. 543;184 Fed. Rep. 657; Hamilton v. Young (Kan.),225 Pac. Rep. 1045; Adams v. Swig (Mass.), 125 N.E. Rep. 857. Russell was within the protection of the statute.
We now come to the question of the personal liability of the trustees upon the contract of March 25th, 1920. A trustee is personally liable on the contracts which he makes as trustee, unless, from the terms of the contract itself, or from the surrounding circumstances it appears to have been the intention of the contracting parties to exempt the trustee from personal liability. Restatement-Trusts § 262, 263. Extrinsic evidence is admissible to show what the parties intended. Anselmo v.Franck, 109 N.J. Eq. 480. The trustees are not named as parties to either contract or note, but rather the promissor named is the "Sugola Company of America." The annotator in 138 A.L.R. 172
says, "On principle, it would seem obvious that a signature in the form `Estate of Richard Roe, by John Smith, executor,' or in similar or comparable form, where some estate, trust, or guardianship is apparently the contracting party, does not indicate that the trustee, executor, administrator, or guardian, is a party to the instrument and does not render him personally liable." While the cases are not *Page 252 
altogether harmonious, the foregoing seems to be sound. But I need not determine whether the trustees were personally liable on the contract. It is enough that liability was so doubtful that the executrix might well conclude to abandon the suit rather than incur more expense in the litigation and expose the estate to a judgment for costs.
In order to obtain judgment for breach of the contract, the executrix need not only show that the defendants were personally liable, but must prove that Winter suffered damage from the failure of the defendants to pay their subscription to the stock of the New Jersey company. I take it that appellants think his stock became less valuable because of the breach — that the enterprise collapsed from shortage of capital. But the proofs in the Orphans Court do not so indicate.
Part of the New York action depended on alleged fraudulent representations. How could the executrix prove them? Michael Winter, of course, was dead and so was his son Frank, who had been associated with him in business. The appellants point out no witnesses or exhibits to establish the claim. I conclude that executrix was fully justified in abandoning the Sugola case.
The tenth exception reads: "Exception is taken that the executrix has not listed a claim possessed by the estate against the German National Government through the German and United States Mixed Claims Commission for a balance of approximately $85,000."
Winter's son-in-law, Marcus Stehle, of Stuttgart, became indebted to him August 13th, 1905, in the sum of $35,700. The debt, or some part of it, remained unpaid at the close of the first World War and Winter presented a claim founded on it, to the Mixed Claims Commission of the United States and Germany. In 1925, the agents of the two governments filed a stipulation:
"As the result of conferences had in Germany in 1924 between claimant and representatives of the American Agency and of the German Agency, an agreement was reached whereby an award against the Government of Germany in *Page 253 
this particular claim was to be entered in the amount of $20,000 together with interest thereon at the rate of 5 per cent. a year from January 1st, 1920, to the date of payment. By the terms of this agreement, claimant is to look solely to the said Marcus Stehle and/or the estate of the said Marcus Stehle for the recovery of the balance, if any, of the debt that is the subject-matter of the claim."
Pursuant to the stipulation, a decree against the German government for $20,000 with interest was entered October 30th, 1925. Thereafter, Winter made several unsuccessful efforts to persuade the Commission to re-open the matter and increase the award. Finally, in 1928, he received the amount due under the decree. Appellants say the executrix should have renewed the attempt to re-open the case, and for her failure to do so, should be surcharged. Their theory is that Winter's consent to the agreement between the two agencies for an award of $20,000 was not binding on Winter, and that the stipulation of its agent was not binding on the American Government. No principle of law supporting this theory is advanced by appellants and none occurs to me.
While the exception does not mention a cause of action against Stehle, I have considered whether the executrix should have endeavored to collect from him and have decided she was under no duty to do so. She was informed from a source which appellants concede was trustworthy that in the year before Winter's death, Stehle paid him $10,000 in final settlement. Furthermore, Stehle was a resident of Stuttgart. Any cause of action against him was an asset which vested in the German administrator and for which the executrix was not accountable. The tenth exception was not well taken.
The eleventh exception relates to the refusal of the executrix to allow the claim of Joseph M. Mentz as a preferred claim, or administration expense. The claim was based on a judgment of the New Jersey Supreme Court against respondent as executrix. The complaint in the law court showed that Mentz, as an attorney-at-law, rendered service to testator in connection with the O'Brien suit from 1926 until his death and thereafter in behalf of the estate at the direction of the *Page 254 
executrix, until March 5th, 1930, when the executrix discharged him. The judgment is general and does not specify what sum was awarded for services to testator and what for services to the executrix. The whole amount of the judgment must therefore be considered as a general, unsecured claim, and not an expense of administration.
The first exception reads: "Exception is taken to the Executrix * * * crediting herself with payment of $9,665.25, all the assets of her testator in her possession to Mary Winter and Arthur B. Seymour, attorney for Mary Winter, on the ground that such transfer of the assets of the estate was illegally and improperly made and on a claim that had no legal merit."
The court ordered that the exception be allowed "in so far as the delivery of the assets of the estate by Gertrude Mentz, executrix, was prejudicial to the exceptant Joseph M. Mentz." There should have been a more definite determination upon the exception.
There are only two creditors of the estate, Mrs. Winter, testator's sister-in-law, and Joseph Mentz, his son-in-law. The latter's claim, $4,650, was rejected by the executrix presumably in good faith and was eventually established by judgment in the sum of $1,650. In the belief that Mrs. Winter was the only creditor, the executrix on July 30th, 1929, turned over to her substantially all the estate assets in this country, amounting to $9,686. This was only a month after testator's death, and before Mentz instituted suit to establish his claim — perhaps before he had made any claim. Of course, the time to file claims had not expired. The executrix acted at her own risk and is accountable for all assets which have come into her hands, including those turned over to Mrs. Winter. She may have credit for that amount to which Mrs. Winter was entitled by way of dividend. R.S.3:25-7.
The executrix is clearly chargeable with interest. The rate should be one that is equitable, in the circumstances shown.John Agnew Co. v. Board of Education, 83 N.J. Eq. 49 (at p.67); affirmed, Id. 336; Backes v. Crane, 87 N.J. Eq. 229;Melosh v. Melosh, 125 N.J. Eq. 486. She made *Page 255 
delivery of the assets to Mrs. Winter in good faith, the prevailing return on investments is very low, and lastly, the long delay in the settlement of this matter has been due to the dilatory conduct of the appellants. The executrix will be charged four per cent. per annum simple interest from July 30th, 1929, on the net estate that should be in her hands, namely, $8,716.
The problem is to determine how much must the executrix pay to appellant Mentz, what is his rightful share in the estate. In order to establish equality of treatment of his claim and that of Mrs. Winter, let us first calculate the amount due her on November 1st, 1932, the date of the judgment in favor of Mentz. Her claim was based on two demand notes, one for $20,000 dated June 15th, 1923; the other, for $6,000 dated July 23d 1923. The notes do not mention interest. On a promissory note, payable on demand, which does not mention interest, interest does not begin to run until demand is made, either specially or by the commencement of an action. Adams v. Adams, 55 N.J. Eq. 42. In the instant case, no demand for payment is shown, but Mrs. Winter instituted suit against the executrix shortly before July 30th, 1929. Adding interest from that day, the debt amounted to $31,070 on November 1st, 1932.
As already related, Mrs. Winter realized something from the estate in Germany. She there filed a claim for 95,004 Reichsmarks. On this, she was paid March 24th, 1931, a dividend of 16 per cent. or 15,200 Rentenmarks, and on July 16th, 1932, she received a final dividend of 49 1/2 per cent., or 47,027 Rentenmarks. When an estate is insolvent, creditors of the same class must be paid pari passu. This rule applies where an estate is being administered in several jurisdictions. A creditor who receives a dividend in one jurisdiction will not be allowed to share with other creditors in another jurisdiction until they have received the same proportionate amount of their claims that he has already been paid. 31 C.J.S. 1251; Restatement-Conflictof Laws § 502; 44 A.L.R. 802; 92 A.L.R. 596. It is the equitable principle of equality. In the present instance, it would not be equitable *Page 256 
merely to say that since Mrs. Winter received dividends of 65 1/2 per cent. in Germany, that she should receive nothing in New Jersey until Mentz has been paid 65 1/2 per cent. In order to secure real equality, we must take into consideration what Mrs. Winter actually obtained by her superior diligence.
The first dividend was converted at the current rate of exchange into $3,623. Interest thereon to November 1st, 1932, increases the amount to $3,953. Mrs. Winter must credit that sum. The value of the second dividend is affected by a number of factors. Mrs. Winter was put to the necessary expense of engaging attorneys in Germany, not only to procure administration of the estate but also to conduct a suit against decedent's widow in order to make her surrender the estate to the administrator. These expenses were a charge on her dividend. Furthermore, the dividend consisted principally of mortgages of the face value of 38,500 Rentenmarks and accrued interest of 4,385 Rentenmarks. The largest mortgage, in the nominal sum of 15,000 Rentenmarks was worth only about half that amount. Lastly, when the Public Administrator wound up the estate, there were in force two German decrees, one granting a moratorium to debtors which prevented collection of the mortgages; the other prohibiting the export of capital. Mrs. Winter was a resident of East Orange, New Jersey. What was the dividend worth to her? What would a well-informed speculator have been willing to pay in America for her title? The nominal rate of exchange was around 4.20 Rentenmarks to $1, making 47,027 Rentenmarks to equal $11,200. Strike off a fifth for the poor quality of one of the mortgages and for legal expenses, and then a third on account of the moratorium and the ban against capital exports. A fair estimate of the worth in this country of the final dividend as of November 1st, 1932, might be $6,000. Taking both dividends into account, I find that Mrs. Winter received in Germany the equivalent of a dividend of 33 1/3rd per cent. on her claim of $31,070; that this was the value in New Jersey of her German dividends. Mr. Mentz must receive the same percentage on his claim of $1,716, or $572, before Mrs. Winter is entitled to a dividend *Page 257 
here. The balance of the net estate will be divisible between Mrs. Winter and Mentz in the ratio of the two claims, 94 3/4ths per cent. to the former and 5 1/4th per cent. to the latter. Such is the calculation, but Mrs. Winter, of course, has already been paid her dividend and the executrix will be credited accordingly.
The Orphans Court reserved action on an exception to fees which had been paid by the executrix for the services of counsel in sundry litigation and tax matters. The fees were reasonable and the exception should be disallowed. The Orphans Court also charged the estate with all the expenses of the hearing on the exceptions, not only with the counsel fee and costs of executrix but with those of appellants and respondent Mary Winter. It appears that executrix years ago offered to pay Mentz his judgment in full, provided his wife would drop the litigation. Mrs. Mentz, acting on the advice of her husband, refused. Under the circumstances, the appellants and Mrs. Winter should bear their own costs in the Orphans Court, as well as in this court.
The order of the Orphans Court on the exceptions will be modified in accordance with the foregoing. The estate is insolvent, so the decree of insolvency will be affirmed, as well as the order fixing the compensation of the master. *Page 258