**William S. SPEED et al., Plaintiffs,**

v.

**TRANSAMERICA CORPORATION, Defendant.**

**Jack FRIEDMAN et al., Plaintiffs,**

v.

**TRANSAMERICA CORPORATION, Defendant.**

**Philip ZAHN, suing individually and on behalf of all similarly situated holders of Class A Common Stock of Axton-Fisher Tobacco Company, Plaintiff,**

v.

**TRANSAMERICA CORPORATION, Defendant.**

**Civ. A. Nos. 480, 468, 490.**

United States District Court
D. Delaware.

Sept. 21, 1955.

On Form of Final Decree Nov. 2, 1955.

See also, 103 F.Supp. 47.

178

Daniel O. Hastings, Ayres J. Stockly and Clarence W. Taylor (Hastings, Lynch & Taylor), Wilmington, Del., and Arthur Frank and Claude L. Gonnet (Frank & Gonnet), New York City, for plaintiffs Friedman and Speed.

Samuel Handloff, Wilmington, Del., and Samuel J. Levinson and Frank Weinstein (of Weinstein & Levinson), New York City, for plaintiff Zahn.

William H. Foulk and Herbert L. Cobin, Wilmington, Del., for intervenors.

Edwin D. Steel, Jr. and William S. Megonigal, Jr. (Morris, Steel, Nichols & Arsht), Wilmingon, Del., Gerhard A. Gesell, Abram J. Chayes, David E. McGiffert, and George H. Buschmann (Cov-

ington & Burling), Washington, D. C., and Thomas B. K. Ringe and J. Wesley Oler (Morgan, Lewis & Bockius), Philadelphia, Pa., for defendant.

LEAHY, Chief Judge.

Defendant's legal responsibility for damages was decided. Speed v. Transamerica Corp., D.C.Del., 99 F.Supp. 808. Col. E. Ennalls Berl was appointed Special Master, to find and determine the amount of plaintiffs' recovery, and to determine any personal defenses which defendant might urge.[1]

The Special Master commenced the performance of his duties.[2] He completed his final report on March 31, 1954. On that day he made corrections on the last several pages. The next day he died. He never signed his final report.

The parties disagreed as to whether the final report could have judicial acceptance for filing. I resolved the problem by entering an order providing for my independent determination of all the issues relating to defendant's liability for damages and to the special defenses urged by defendant. It was agreed the Court's determination might be had upon the record made before the deceased Special Master and upon any additional proof the parties might offer the Court.[3]

This old and complex litigation is now approaching its final phase in this Court. Questions of law must be considered as well as factors affecting the exercise of the Court's discretion. The record before the late Master shows few, if any, disputed issues of fact. The Court must determine the measure of damages. Once the appropriate rule is settled, the record before the Master furnishes all the data necessary to compute the amounts payable to plaintiffs. The questions for decision are: 1. the measure of recovery of the several classes of plaintiffs; 2. what interest, if any, should be allowed on the sums awarded; 3. the right of certain individual plaintiffs to participate in the recovery.

■ The purpose here is to assess damages which will compensate plaintiffs for any harm suffered as a result of defendant's improper conduct. Various plaintiffs do not stand in the same relationship to Transamerica. The Zahn-Friedman plaintiffs surrendered their shares at the call of the directors of Transamerica. The finding was made[4] that the call was illegal. Damages for such breach are usually, but not always, measured according to principles of restitution.[5] As to Speed plaintiffs, Transamerica did not acquire the shares through the exercise of any call. Defendant was a purchaser of these shares. A restitution theory of recovery, based on breach of fiduciary duty, would seem inapplicable, for the liability in these cases is based upon an implied misrepresentation of fact. The measure here, defendant suggests, is the difference between what the Speed plaintiffs received and the fair value of their shares at the time they sold their shares to defendant.

1. Absence of jurisdictional amount was raised against plaintiffs Bean, Cohen, Friedman, Lomoff, Shapiro and Shenker; the defense of sale of shares was urged against plaintiff Benson; and lack of proof of share ownership was raised against plaintiff Percival J. Steindler.

2. The Special Master received 422 claims, filed by shareholders. There were numerous conferences with counsel. He presided at examinations before trial in New York City. He heard testimony and received documentary proofs. The transcript before him totals 1,123 pages. Numerous exhibits were received. Several days were devoted to argument. Counsel filed 18 separate briefs. On December 31, 1953, he submitted a draft report to counsel, in accordance with FR 53(e) (5). Thereafter, counsel submitted 15 additional memoranda. At the time the Special Master commenced to prepare his final report, he had thousands of pages of transcript, of arguments, and thousands of pages of briefs and exhibits.

3. The only additional proof received were portions of certain amendments filed by Axton-Fisher to its registration statement with the Securities and Exchange Commission.

4. D.C.Del., 99 F.Supp. 808.

5. Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36.

### Part I.  Principal Amount Recoverable

#### 1.  The Zahn-Friedman Case

a.  In the Zahn-Friedman case, 15,397 shares of stock were denied by the call from sharing in the net proceeds of Axton-Fisher available on dissolution. There is apparently no conflict between the parties that these proceeds, adjusted to take account of the rescission of the call, amounted to $16,034,631.33.  The single issue as to these particular plaintiffs is what basis is to be determined, assuming they would have participated in these proceeds.

In sum, Zahn-Friedman plaintiffs' position is the call of their A shares was illegal.  Hence, they are entitled to participate in the liquidation in accordance with their liquidation rights as described in the Axton-Fisher charter as to the A shares.  These plaintiffs warn of the error of the Special Master in the amount of the per share recoverable principal per unredeemed and per redeemed A share, because, they claim, he erroneously excluded $80.80 which should be paid as part of the recoverable principal.  They also argue he was in error in reducing the recoverable principal per unredeemed and per redeemed Zahn-Friedman A share by $16.90, by improperly combining with the 15,397 Zahn-Friedman A shares the 13,796 Speed A shares and the 5,707 Speed B shares so as to make the number of A shares participating in the preferential dividend arrears payment 21,193 instead of 15,397, with the result the number of combined residual liquidation units were 186,670 instead of 172,-874.

The apparent specificity of these arithmetical figures will come into focus, *infra*, when it is disclosed they are irrelevant until the final decree is entered herein fixing exact liability of defendant Transamerica.

█ We are now driven to the utilization of the first basic assumption, e. g., that the call would have been made, accompanied by adequate disclosure of intent to liquidate and disclosure of the true values underlying all shares outstanding.  Given such a call and disclosure, the Zahn-Friedman plaintiffs would have exercised the privilege, granted under the charter and their share contracts, to convert their shares from Class A to Class B stock.  They would have participated in the liquidation as B shareholders.  On this basis, their participation in the proceeds would have amounted to $101.82 a share (or such other mathematical figure to be fixed in the final decree to be entered) against which would have been credited the redemption price of $80.80 which these plaintiffs each received or could have received since the redemption date.  Under this view, $21.02, for example, is the principal amount of the damages per share.  In short, these plaintiffs should be put in the position they would have had *ex* the illegal call, and had the affairs of Axton-Fisher proceeded to its dissolution without any improper conduct on the part of defendant Transamerica.

The Zahn-Friedman cases were given prior consideration in Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, where the Court held the resolution redeeming the A shares was "voidable in equity at the instance of a stockholder injured thereby."[6]  Thus, the Court said these plaintiffs might "maintain [their] cause of action to recover from Transamerica the value of [their] stock * * * as that shall be represented by its aliquot share of the proceeds of Axton-Fisher on dissolution."[7]  The Court of Appeals' opinion left two unknowns to be found: 1. the amount of the "proceeds of Axton-Fisher on dissolution" and 2. the "aliquot share" of the proceeds allocable to each share held by plaintiffs.

At the threshhold of the matter for decision here, I must apply the "what might have been" doctrine.  Necessarily this is conjectural; but the problem must be worked out with regard for the reasonable expectations of stockholders, based upon the corporate relationships,

6.  Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, at page 46.

7.  Id., 162 F.2d at page 47.

in order to reach a result which is fair and equitable. The litigants agreed, on recreating a valid liquidation I must give effect to the presence of assets which were not available for distribution in the *actual* liquidation,[8] and of shares which did not, in fact, participate in the distribution of those assets.[9] In passing, I note plaintiffs contend for reconstruction of corporate acts which might have been —but were not. To do equity to plaintiffs, they argue, all conjectures must be for the highest dollar of recovery. This view, of course, ignores examination of any intervening circumstances; and is bottomed on the proposition plaintiffs would have continued as Class A shareholders with power to enforce liquidation preferences during the eleven months that elapsed between the illegal call and the dissolution on May 31, 1944. Plaintiffs thus demand $23.73 per share, corresponding to accrued dividends, and a division of the remaining proceeds on the basis of an amount per share equal to double that allocable to each B share. Such a distribution would amount to three times the call price fixed by the charter of Axton-Fisher for the A shares.

The invalid call of April 30, 1943 restores plaintiffs to the status of Class A shareholders as of July 1, 1943, the redemption date. But, this does not solve the difficult damage question to be decided. Plaintiffs' status as of May 31, 1944, the liquidation date, will be determinative of their "aliquot share".

Under the real or "what might have been" liquidation, a disinterested board could have legally called the A stock. The A shares then would be powerless to exercise their two-for-one liquidation preference. Three Courts, analyzing the particular problem, agree on this legal exercise of power by disinterested directors (for the benefit of the B shares, who, under the charter, were the beneficiaries of the residual assets). For example, in Taylor v. Axton-Fisher Tobacco Co., 295 Ky. 226, 173 S.W.2d 377, 148 A.L.R. 834, the Kentucky Court held the benefit to the B shareholders resulting from a call was the legal fact which made the call irrevocable. This is primer corporate law. In Zahn v. Transamerica Corp., D.C.Del., 63 F.Supp. 243, at page 246, I accepted the legal fact the charter did not prohibit a call which would deprive A shareholders of the right to exercise their liquidation preferences. The Court of Appeals did not question this. It affirmed this interpretation of the charter by writing *"the act of the board of directors in calling the Class A stock [was] an act which could have been legally consummated by a disinterested board of directors * * *"*. (Emphasis added.) 162 F.2d at page 46. Thus, all three Courts recognized a call by a disinterested board of directors in anticipation of liquidation was legally authorized by the Axton-Fisher charter. It is not abstract speculation but a certainty any disinterested board would exercise the power to call the A shares in the normal course of business judgment prior to liquidating the company. Such a call would have existed *ex* any improper scheme. Assuming intent to liquidate, a call would disclose an intention to liquidate together with information about the appreciated value of Axton-Fisher's tobacco inventory. The A shareholder would have been bound to elect whether to surrender his stock for $80.80, the redemption price, or to exercise the conversion privilege granted by the charter to convert to B stock on a one-for-one basis. Only by adopting the second course would plaintiffs have participated in the liquidation at all, and then as a B shareholder with such shareholder liquidation rights.

8. First, the tobacco distributed in kind must have a dollar value. Different values may reasonably exist within a broad frame. However, Transamerica has accepted a valuation of all the tobacco at the average price realized by it on sales. Second, $1,244,077.60 deposited in the Fidelity Columbia Trust Co. of Louisville for redemption of A shares but which, absent the April 30, 1943 call, would have been available for distribution.

9. The 15,397 A shares which were called.

There is no other basis except Zahn-Friedman plaintiffs should recover as B shareholders upon a reconstructed liquidation of Axton-Fisher. A disinterested board of directors would call the Class A shares before liquidation because it would have been to the advantage of the junior securities, the Class B stock, and this could have been a matter of sound business judgment.[10]

Such a call option is always reserved as against senior securities for the benefit of the junior securities.[11] In fact, "the chief function of the provision for redemption in stock or bonds is to facilitate the retirement of senior securities for the benefit of the holders of the common shares * * * ".[12] The benefit conferred on junior securities (owners of the equity) is to be rid of restrictions and prior claims to assets and earnings.[13] It is orthodox procedure in the financial community when the value of senior securities in terms of earning power and assets exceeds the call price, to exercise the option.[14] When a senior security has greater earning power and increased assets behind it, the redemption or call benefits the junior security and this is disadvantageous to holders of the senior called shares. Detriment may result to the senior security-holders from the restricted opportunity for reinvestment, from elimination of rights to participate in management, or from taking the senior shareholder out of a profitable investment.[15]

Anyone aware of the essential capital structure of modern corporate enterprise knows, the exercise of redemption options are arbitrary decisions, because under our system of democratic capital they are the result of the bargaining of parties to the share contract. It is classic procedure to allocate potential benefits to junior shareholders at the expense and to the disadvantage of the senior class of shareholders. A senior security seeks security; a junior security assumes risk. This is the legal bargain. The exercise of a call does not operate equitably as among the several groups of shareholders affected. It is the Hornbook law of Wall Street, "A preferred issue * * * does not ordinarily rise in price very far above the call price." [16]

It has been suggested the excess over the call price which the market may sometimes give reflects the time required to effect a call.[17] Where the callable issue is convertible into other securities, as here, the call price does not act as a ceiling, but the market reflects the value of the shares into which the callable stock may be converted. In addition to the text writers, both courts and administrative agencies have relied upon the call feature in solving complex problems in

10. These charter provisions are, "a contract giving the corporation an option to repurchase [the] shares at a stated price." Zahn v. Transamerica Corp., D.C.Del., 63 F.Supp. 243, at page 247; Taylor v. Axton-Fisher Tobacco Co., 295 Ky. 226, 229, 173 S.W.2d 377, 379, 148 A.L.R. 834.

11. Mannington v. Hocking Valley R. Co., C.C., 183 F. 133, 143; cf. Davis v. Louisville Gas & Elec. Co., 16 Del.Ch. 157, 142 A. 654, 655, 659.

12. Ballantine, Corporations § 263 (Rev.Ed. 1946).

13. Gerstenberg, Financial Organization and Management of Business, pp. 85–86 (3d Ed. 1951); Hoagland, Corporation Finance, p. 143 (3d Ed. 1947); Kumball, Principles of Corporation Finance, p. 47 (1939); Mead & Warrington, The Public Corporation, p. 90 (1941); and see Taylor v. Axton-Fisher, supra, 173 S.W. 2d 377, 380.

14. Northern New England Co., Public Utility Holding Company Act Release No. 9982, pp. 11, 12; North American Co., PUHCA Rel. No. 5796, p. 9; Graham & Dodd, Security Analysis, pp. 303–4 (2d Ed. 1940).

15. See, e. g., Hoagland, Corporation Finance, p. 143 (1947); Husband & Dockery, Modern Corporation Finance, p. 88 (3d Ed. 1952).

16. Kamm, Economics of Investment, p. 121 (1951); See Jome, Corporation Finance, p. 96 (1948).

17. Engineers Public Service Corp., 24 S.E.C. 551 at p. 579.

corporate law.[18]  *The call feature has been so considered even though the intrinsic value of the called shares may far exceed the call price.*  This is the position taken by the Securities and Exchange Commission on securities subject to call and the Commission's expertise has been accepted by the profession without criticism.[19]  Another example is found in the tax field of option valuation. Judge Learned Hand has written: Commissioner v. McCann, 2 Cir., 146 F.2d 385, 386, "An option immediately exercisable—a 'call'—will, however, ordinarily be regarded as a limit upon market value, *or any other value however ascertained or ascertainable,* because the person having the option, if well advised, will exercise it as soon as the value rises above the option price.  If there are reasons why he will not then do so, he must prove them who wishes to discard the option price as the measure." [20]

A senior security with preferences, instead of providing valuable leverage as a junior security, when earning power and asset value increase, becomes a financial burden to the junior owners of the residual assets.  "Ordinarily a company in this position would exercise its call privilege and redeem the preferred at its call price."  Engineers Public Service Corp., 24 S.E.C. at p. 574.  Thus, *ex* an illegal call and if the call had disclosed the increased value of the inventory,

the only fair and equitable value to assign to the A shares would be a value equal to its call price.

A comparable analysis of the liquidation of Axton-Fisher was made by Edward Hopkinson, Esquire.  He confidently predicted the course of action which would follow the exercise of normal business judgment by a disinterested board of directors.[21]  Mr. Hopkinson testified:

"I would calculate the amount which each share of class A stock would be entitled to receive out of the estimated net realizable value of the assets upon the assumption that liquidating distributions in accordance with subparagraph (i) of Article IV of the charter were made to them, namely:  accumulated dividends plus $2 a share for each $1 per share paid to the class B stockholders.  If the amount so distributable to the class A stockholders was less than the redemption price of $60 per share, plus accumulated dividends, I should assume that the class A would not be called.[22]  *  *  *

"Second, if my computation which I have described should indicate that the amount distributable to the class A stockholders under subparagraph (i) of Article IV of Axton-Fisher charter would be in excess of the call price, then I should assume that prior to liquidation the class A stock would be called at the redemption price, and that the class B stockholders

18.  Under the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., the SEC in reorganization has established "since the holders of junior securities have a right to retire the preferred at the redemption price", that price sets the ceiling on the participation to be awarded callable shares in the reorganized company.  Buffalo, Niagara & Eastern Power Corp., 20 S.E.C. 647, 683; Engineers Public Service Corp., 24 S.E.C. 551, 579;  New England Power Association, 22 S.E.C. 343, 376–77;  American Power & Light Co., 21 S.E.C. 191, 196, 210–11.

19.  Billyou, Priority Rights of Security Holders in Bankruptcy Reorganization: New Directions, 67 Harv.L.Rev. 553, 575–76;  Dodd, Preferred Shareholders Rights —The Engineers Public Service Company Case, 63 Harv.L.Rev. 298, 304.  The

Supreme Court has adopted this view.  SEC v. Central-Illinois Securities Corp., 338 U.S. 96, 106–107, 145, 69 S.Ct. 1377, 93 L.Ed. 1836.

20.  See also, Helvering v. Salvage, 297 U.S. 106, 109; 56 S.Ct. 375, 80 L.Ed. 511;  May v. McGowan, 2 Cir., 194 F.2d 396;  Wilson v. Bowers, 2 Cir., 57 F.2d 682.

21.  Mr. Hopkinson has been a partner in the firm of Drexel & Co. of Philadelphia since the firm commenced.  He has extensive financial and legal background and experience in management of security investments and in assisting both State and Federal Courts as well as the Securities and Exchange Commission in an effort to solve difficult corporate problems.  Masters' Transcript 297–301.

22.  Masters' Tr. 304–05.

would receive the remainder of the assets." [23]

His analysis of the facts of the present case demonstrates there could have been nothing else but a call prior to liquidation. Masters' DX 25 shows net realizable value of Axton-Fisher assets on March 31, 1943. If on that date the company had paid its liabilities, retired its preferred stock, satisfied its dividend arrearages on preferred and Class A stock, and then liquidated without calling the A stock, each A stockholder would have received $91.62. This would have been more than the call price of $60. This evidence is uncontradicted.

b. The ineluctable fact is the Axton-Fisher charter did not prohibit a call of the A stock in anticipation of liquidation. In all corporate problems it is necessary to analyze provisions of the charter and the share contract between the corporation *vis-a-vis* the stockholder, and the share contract between the various groups of security holders *inter sese*. This is the dichotomy of corporation law. Here, the Axton-Fisher A shares had a combination of extraordinary features not found ordinarily in senior corporate securities. The participation of the A stock in corporate earnings and assets depended upon the degree of success which the corporation enjoyed. The call price of $60 was *$50* above par and *$40* above the initial liquidating value; and this master fact has importance: A stock was convertible one-for-one into Class B shares at the option of the holder.

As said before, the financial community long ago concluded call prices of redeemable securities are set somewhat above the par value of the stock to enable "the stockholder to tide over the period required to reinvest advantageously or compensate him for a lower return on his next investment if the redemption comes at an inopportune time for him." [24]

Thus, a premium price is a few points above par or above a fixed liquidation price of the security. This spread above par and asset value envisions something in addition to the minor inconvenience of reinvestment by the A shareholder in event of call. In the instant case the high call price was intended to protect the radical preferences of the A over the B shareholders as to earnings and assets during the period of corporate growth. Obviously, the call dollar-price given to the A shares froze the ceiling of the A shares on any conceivable fair basis. The A shares had a conversion feature on a one-for-one basis into B shares, and it could mean nothing but advantageous to convert the A shares into B shares when a call occurred.

I have discussed the detail of the share contract *inter partes* for it discloses a recognized system of checks and balances, protecting the position of each class of securities to maintain equity and fairness in all sorts of circumstances which might arise in the course of the corporate destiny of the company, whether for growth or liquidation, voluntary or involuntary. It was a contract between classes of shareholders which excluded the doctrine of preordination.

Under the circumstances of Transamerica's misconduct in the present case, an A stockholder, who would have been advised, would have done nothing but elect to convert. The plain equity is the participation of the A shares in the reconstructed liquidation should be measured, according to the charter and the share contract, by the liquidation rights of a B shareholder. This view of the claim of the A shareholders was recognized at the time of the 1943 call by Judge Dawson, an Axton-Fisher director of unchallenged independence (a man whose integrity I have referred to throughout this litigation). He played one of the main roles in the corporate incident which is the subject of this judicial in-

23. Id., p. 306.

24. Greedlinger & Johnston, Financing, p.

125 (1950); see also, Husband & Dockery, Modern Corporation Finance, p. 88 (3d Ed. 1952).

quiry. Under date of June 8, 1943, Judge Dawson wrote: " * * * if liquidation, merger or sale of substantially all of the assets in the immediate future is contemplated by those in control, it would seem that equity and fair dealing would require that the holders of Class A stock, well in advance of any redemption thereof, should be given full information as to the probable profit which would result from liquidation, merger or sale of the company's assets, and given an opportunity to elect between surrendering their stock for redemption or exchanging it for Class B common stock, *enabling them, by such exchange, to participate in any benefits of liquidation.* * * *

"I have been advised that the controlling stock interests of the corporation have concluded that the corporation can not afford to fritter away the apparently tremendous inventory profit in operation; and in view of this fact, and of other matters hereinabove referred to, I think the Board of Directors should at once, by proper order, extend the date of redemption to August 1, 1943, and promptly notify all Class A stockholders of all pertinent facts so that they may make their own decision as to whether or not they will exchange their Class A Common stock for Class B stock, or will surrender their stock and accept $80.80 per share in redemption thereof." (Emphasis added).

Looking at the historical incident of this litigation, objective observers have reached the same conclusion after analysis of the Axton-Fisher situation. The Harvard Law Review[25] states: "The parties to the present agreement must have contemplated that the majority would exercise the power of redemption should the enterprise prove successful, since the right of conversion can only be explained as a measure of protection against redemption * * * It would seem unreasonable, therefore, to suppose that the Class A stockholders expected to realize large benefits under the dissolution provision." No one would disagree if a recovery on a two-for-one basis were to be granted the A shares, "they will get a windfall far in excess of [their] contractual rights * * * recovery must be limited to the dissolution value of an equal number of Class B shares".[26]

In isolating the totality of equities in the present litigation, I conclude the extent of the Zahn-Friedman plaintiffs' rights in the reconstructed liquidation are the same and no greater than B shareholders. This is in accordance with their share contract, in the fact of the impact of the realities of corporate experience, as reflected in call options. Such application of equitable principles is in agreement with court and administrative authorities and financial texts. It is a "fair and equitable" treatment to all holders of callable A shares.

c. There remains the determination of the "aliquot share" to the stock represented by the Zahn-Friedman plaintiffs. The computation is simple. 15,397 A shares were outstanding on July 1, 1943, the redemption date.[27] Absent the illegal call of April 1943, these A shares would have been callable before liquidation by a disinterested board of directors after making adequate disclosures of increased values of inventories. Such call would have put an A shareholder to elect between surrendering his shares for redemption or converting them on a one-for-one basis for B stock. *Ex necessitate* we indulge in the assumption of "reconstructed liquidation", and the A shares would have converted. Plaintiffs A shareholders either have taken down $80.80 per share, or such amount has been deposited against the redemption of the stock in the Fidelity & Columbia Trust Co. of Louisville. These amounts, either received or receivable by the A shareholders, must be deducted from the

---

25. 61 Harv.L.Rev. 359, 360. Accord: 96 U. of Pa.L.Rev. 276.

26. Id., p. 360.

27. These are the shares which, under the

Court of Appeals' opinion, should be taken into account in calculating plaintiffs' participation in the reconstructed liquidation.

"aliquot share". This determines the principal amount of damages owing to plaintiffs who owned A shares.

## 2. The Speed Case

Relief in this separate case seeks restoration to Speed plaintiffs as to A shareholders on dissolution $148.09 and to B shareholders $70.18. Basis of alleged liability to Speed plaintiffs is different (although the measure of recovery is identical) from liability to Zahn-Friedman plaintiffs. In Speed, corporate mechanisms of Axton-Fisher were not used in the acquisition of these plaintiffs' shares. Transamerica was a buyer and plaintiffs were sellers. Defendant Transamerica urges I ignored any breach of fiduciary duty in the companion case of Geller v. Transamerica Corp., D.C.Del., 53 F.Supp. 625, affirmed 3 Cir., 151 F.2d 534. Defendant says I drew a distinction that Transamerica is "accountable" to the Zahn-Friedman plaintiffs,[28] but only liable in damages to Speed plaintiffs.[29] The labels suggested for relief are unimportant. Legal reality is what measure of compensation will be fair and equitable to both A and B shareholders who were all victims of a sharp corporate campaign (a "fast deal") designed and executed by Transamerica against minority publicly held shares.

■ Some of Speed plaintiffs were owners of A shares. While their shares were not called and redeemed, as in the Zahn-Friedman case, they were, in fact, sold by the holders to Transamerica before the actual call took place. I apply the same damage formula to these Speed plaintiffs as has been fixed as the measure of damages for the holders of A shares in the Zahn-Friedman cases. This leaves to be considered rights and liabilities growing out of the sale of Speed plaintiffs' B shares to Transamerica. As to the latter, defendant urges the orthodox measure of damages in a misrepresentation case is the difference between the price received and the fair value of the article sold.

1. The rights of both Speed A and B plaintiffs arise: 1. from defendant's breach of duty to disclose as controlling stockholder; and 2. from defendant's breach to disclose under Rule X–10B–5 of the Securities and Exchange Commission. In fixing liability, I said:[30]

"It is unlawful for an insider, such as a majority stockholder, to purchase the stock of minority stockholders without disclosing material facts affecting the value of the stock, known to the majority stockholder by virtue of his inside position but not known to the selling minority stockholders, which information would have affected the judgment of the sellers. The duty of disclosure stems from the necessity of preventing a corporate insider from utilizing his position to take unfair advantage of the uninformed minority stockholders."

In this particular relationship, the injured party is not held within the limitations of the difference between price received and fair value of article sold. The injured party is entitled to require the perpetrator to disgorge gains made at the expense of the injured. I said:[31] "* * * Some courts have called this a fiduciary duty while others state it is a duty imposed by the 'special circumstances'". I have already determined defendant was an "insider".[32] As such, defendant was master of the corporate household and could not rely on arm's-length dealing with its minority. Kardon v. National Gypsum Co., D.C., 73 F.Supp. 798, dealt with this situation and likewise involved an action for violation of Rule X–10B–5. In that case, Judge Kirkpatrick suggested a fiduciary relationship existed by virtue of the Rule. I cited the Kardon case with approval in fixing defendant's liability to plaintiffs here,[33] for those in dominating positions have high duties to other security hold-

28. D.C.Del., 99 F.Supp. at page 849.

29. Id., 99 F.Supp. at page 843.

30. Id., 99 F.Supp. at pages 828–829.

31. Id., 99 F.Supp. at page 829.

32. Id., 99 F.Supp. at page 829.

33. Id., 99 F.Supp. at page 829.

ers which will be strictly enforced.[34] While no formal status has been given to the Special Master's Report, I have read it assiduously. Regarding this issue, he also wrote: [35]

"There is something shocking in the suggestion that a defrauded stockholder is restricted to an action for damages measured by the value of his stock on the day upon which it was fraudulently procured from him, thus leaving the defrauder quit of liability by the payment of the value of the stock on that day and free to enjoy, as was the case here, the large profit for which it schemed when it committed the fraud."

And later, in recognition of the broad sweep of equity, the Special Master said: [36]

"This, however, is a matter upon which I need not dwell, because the law of Restitution operates with equal effect upon persons who were fraudulently deprived of their stock by a fiduciary and upon those who were fraudulently and tortiously deprived of stock whether by one who was their fiduciary or by one who was not."

A new work, "Securities Regulation", by Professor Loss, more precisely considers the subject of relief available to a plaintiff under Rule X–10B–5: [37] "In appropriate circumstances it seems clear that the plaintiff should also be able to seek an accounting or receivership or any other of the traditional equitable remedies;" while Charles Hughes & Co. v. Securities and Exchange Commission, 2 Cir., 139 F.2d 434, considered the Securities Exchange Act, 15 U.S.C.A. § 77

q(a), as placing a defendant under a "special duty". Another variation on the theme of liability, i. e., relationship of Transamerica as majority and controlling stockholder, was described by Chief Judge Biggs in the Zahn case. He wrote: [38]

" * * * In our opinion, however, the law of Kentucky imposes upon the directors of a corporation or upon those who are in charge of its affairs by virtue of majority stock ownership or otherwise the same fiduciary relationship in respect to the corporation and to its stockholders as is imposed generally by the laws of Kentucky's sister States." Judge Biggs then concluded: [39]

"The tenor of the federal decisions in respect to the general fiduciary duty of those in control of a corporation is unmistakable."

Moreover, the special circumstances rule requires such relief according to the law of Kentucky, where the transactions occurred. In the case of Hays v. Meyers, 139 Ky. 440, 107 S.W. 287, 289, 17 L.R.A.,N.S., 284, it was held where "the circumstances surrounding the · parties and the transaction are such as to make it the duty to disclose the information not within the knowledge of the other, equity will afford relief." [40]

2. As stated, on this facet of the case, defendant's argument is recovery for Speed plaintiffs is limited to the difference between the price received and the fair value of the stock at the time of sale. Support for this are citations to Prosser on Torts, § 90, and Restatement

---

34. Consolidated Rock Products Co. v. DuBois, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982 (per Justice Douglas).

35. Special Master's Final Report, at p. 13.

36. Id., p. 22.

37. Loss, "Securities Regulation" (Fraud By Corporate Insiders), p. 1065.
   The authoritative nature of the text was recognized by Judge Goodrich in First Trust & Savings Bank v. Fidelity-Philadelphia Trust Co., 3 Cir., 214 F.2d 320, at page 324: "On the other hand, Professor Loss says that there are various kinds of mechanical activities which

do not come under the statute and his extensive experience in this field gives his view importance, especially in the absence of case law to the contrary."

38. Zahn v. Transamerica Corp., 3 Cir., 162 F.2d at page 42.

39. Id., 162 F.2d at page 42.

40. Other Courts have applied the special circumstances doctrine. Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853; Agatucci v. Corradi, 327 Ill.App. 153, 63 N.E.2d 630. See, also, Fletcher on Corporations (Perm.Ed.), Vol. 3, § 1171, p. 786 et seq.

of Torts, § 549. The body of Professor Prosser's text fails to support defendant. He writes:[41]

"When restitution is sought either in equity or at law a much more liberal policy has been adopted. Since the purpose is not to compensate the plaintiff's loss but to restore what the defendant has received, the courts look to the inequity of allowing him to retain it rather than to the damage which the plaintiff has sustained."

Moreover, Professor Prosser earlier[42] had this to say:

"Misrepresentation was recognized very early as a basis for the jurisdiction of courts of equity, at a time when the existing forms of action at law were inadequate to deal with the injustices which resulted. When the law courts later developed remedies for such cases, the equity courts refused to surrender their jurisdiction, saying that the nature of the 'fraud' made it peculiarly a matter for their interference. The particular form of relief granted by equity might be almost anything appropriate to the particular case; but the most common remedies for misrepresentation were rescission or reformation of a contract between the parties, or requiring a defendant who had been unjustly enriched to hold the money or property he had received subject to a constructive trust, or an equitable lien.

"The equity courts were not bound by rules adopted at law, and proceeded to evolve their own definition of the 'fraud' which would justify relief. Since they did not take jurisdiction for the purpose of giving the plaintiff damages, they were more concerned with the injustice of allowing the defendant to retain what he had received through the plaintiff's erroneous belief in the truth of his statement than with the question of the wrongfulness of his own conduct. Hence, they give a remedy for innocent misrepresentation, without the element of intent which became necessary for the tort action of deceit."

[The Final Report of the Special Master has no official status, for it never received his personal imprimatur. I neither adopt nor reject all or any parts of it. This litigation presented complex problems. The case was considered and subjected to legal analysis by the Special Master over several years of work. His product and labor should not be condemned to some legal purgatory. The Special Master was a learned lawyer and had a delicate sense of the equities. I agree with certain of his views—and disagree with others—as found in his original MS, left unsigned and unfiled.]

The Special Master examined the Restatement of Torts. He pointed out "Restitution" as a legal principle is of recent historical origin, recognizing, too, the principle a party who has been fraudulently deprived of his rights is entitled to be restored to those rights or to recover the "natural and proximate consequence of the act complained of". This has been said before.[43] Because of the scholarly presentation of the doctrine of restitution by the Special Master, I refer to this portion of his MS (pp. 9–17):

[Berl, Special Master.]

"Restitution as a Remedy

"I have given careful consideration to the contention of plaintiffs that the theory upon which damages should be awarded is that of the constructive trust. I believe that the principles applicable to trustees ex maleficio are apposite in the circumstances of this case, but I do not believe that the constructive trust remedy, the one most commonly associated with decrees entered against trustees ex maleficio, furnishes the complete answer in the present case.

"As I see the situation here, the proper remedy lies in the field of restitution,

41. See p. 770.

42. At p. 708.

43. Smith v. Bolles, 132 U.S. 125, 10 S.Ct. 39, 33 L.Ed. 279; Hindman v. First Nat. Bank, 6 Cir., 112 F. 931; Paul v. Cameron, 127 Neb. 510, 256 N.W. 11; Staker v. Reese, 82 W.Va. 764, 97 S.E. 641; Southerland on Damages, § 1173, pp. 4414–15.

which, since the compilation of the Restatement of the Law, has been recognized as a remedy in itself. Although it partakes of the nature of constructive trusts, as well as of rescission, it is not hampered by some of the conditions which attach to those remedies.

"In an article in the Law Quarterly Review for January 1938,[2] Professors Seavey and Scott, the reporters of the Restatement of Restitution discuss extensively the reasons which moved the American Law Institute to publish a Restatement Volume which was to bear a name which could not be applied to any of the principal branches of the law. The authors say:

"'The purpose of the American Law Institute is to analyze the most important topics of the law and to state succinctly the rules which are shown by analysis to represent the predominant American authority. In the restatements already published it has been possible to use familiar names and familiar categories. It so happens, however, that because of the way in which the English law developed, a group of situations having distinct unity has never been dealt with as a unit and because of this has never received adequate treatment. It was for the purpose of making clear the principles underlying this group and of attempting to give it the individual life and development which its importance demands that the restatement of this subject was undertaken. Although it is a rule of the Institute that no new word should be coined, it is consistent with its practice to use an old word with either a more precise or a more generalized meaning. With this in mind, the word "restitution" was chosen, a word which has a connotation of the right to recover back something which one once had.

"'In order to indicate the sweep of the subject and to justify its separate treatment, it may be well to indicate its scope. In brief it includes most of the situations dealt with in the few works on quasi contracts, together with the addition of corresponding matters dealt with in treatises on equity and trusts, including the specific remedy of constructive trust. But we are told by Professor Winfield in one of the most interesting of recent books that the Bar does not know what is included within the term "quasi contract",[*] and for the benefit of those who have been so unfortunate as not to have read his book, it appears desirable to make a more detailed statement as to what is meant by restitution.'

"As illustrative of the scope of restitution the authors say:

"'The law of torts is based upon the premise that a person has a right not to be harmed by another, either with respect to his personality or with respect to his interest in things and in other persons. The law protects this right by requiring a wrongdoer to give such compensation to the person harmed as will be substantially equivalent to the harm done. The accent is upon wrong and harm. Beside these two postulates there is a third, sometimes overlapping the others, but different in its purpose. This third postulate, which underlies the rules assembled in the Restatement under the heading "Restitution", can be expressed thus: A person has a right to have restored to him a benefit gained at his expense by another, if the retention of the benefit by the other would be unjust. The law protects this right by granting restitution of the benefit which otherwise would, in most cases, unjustly enrich the recipient.'

"2. 54 Law Quarterly Review 29."

"* The Province of the Law of Tort (1931), p. 116."

"Again:

" 'Another type of case which has become important in recent years is that where a broker has possession of share certificates owned by a number of customers which he pledges with a third person for a debt of his own, the pledge being valid because the certificates have been endorsed in blank. Here, if the pledgee sells the certificate of one of the customers in order to satisfy the debt of the broker, the customer is entitled to contribution from the others whose certificates were not sold. If it were not for the principle of restitution there would be no remedy.

" 'These cases and numerous others where relief is properly given indicate that a theory of restitution is essential to dealing justly between the parties.'

"With the background of the remedy of restitution thus explained it is not surprising to find the case at bar aptly provided for in the Restatement volume. Sec. 151, I think, covers the situation of this case. It reads:

" '§ 151. Value of Property Acquired by Consciously Tortious Conduct.

" 'Where a person is entitled to a money judgment against another because by fraud, duress or other consciously tortious conduct the other has acquired, retained or disposed of his property, the measure of recovery for the benefit received by the other is the value of the property at the time of its improper acquisition, retention or disposition, or a higher value if this is required to avoid injustice where the property has fluctuated in value or additions have been made to it.'

"In the discussion of Section 151 the authors cover under sub-paragraph (c) what appears to me to be the precise situation of this case:

" 'c. *Where the subject matter is of fluctuating value.* Where the subject matter is of fluctuating value, and where the person deprived of it might have secured a higher amount for it had he not been so deprived, justice to him may require that the measure of recovery be more than the value at the time of deprivation. This is true where the recipient knowingly deprived the owner of his property or where a fiduciary in violation of his duty used the property of the beneficiary for his own benefit. In such cases the person deprived is entitled to be put in substantially the position in which he would have been had there not been the deprivation, and this may result in granting to him an amount equal to the highest value reached by the subject matter within a reasonable time after the tortious conduct.'

"Defendant contends there is no fiduciary responsibility on its part to the Speed plaintiffs or claimants, and says that the Court has not found the defendant to be a fiduciary vis-a-vis them. It may be that the Court has not so found expressly, [Correct] but it is certainly true that the Court has not found that defendant was not a fiduciary as regards those plaintiffs and claimants. [Quaere] I see no advantage, however, in dwelling upon this point, because, under the Restatement, as has been seen from the text just quoted, the liability is the same, whether the wrongdoer was a fiduciary or a tortfeasor in the circumstances which the Court has adjudicated here.

"Not only have the various volumes of the Restatement been treated with authoritative force by the courts to which they have been presented, because of the distinguished character of their authors and editors, but the foregoing statements from the text are in themselves eminently reasonable and just. There is something shocking in the suggestion that a defrauded stockholder is restricted to an action for damages measured by the value of his stock on the day upon which it was fraudulently procured from him, thus leaving the defrauder quit of liability by the payment of the value of the stock on that day and free to enjoy, as

was the case here, the large profit for which it schemed when it committed the fraud.

"Counsel for defendant argue that by fixing damages as the value of the stock at the time when the fraud occurred, presupposing a public knowledge of the additional value of the inventory and of the fact of imminent liquidation, it will have adequately compensated those it defrauded. This, counsel says restricts the horizon of damages for those who were defrauded to the foreseeable future. Its witnesses, under this view, allowing in their testimony for the foreseeable future, testified as to a value figure which was little more than the amount which the defrauded stockholders had already received from defendant. It may be true that in this case the future held out uncertainties, but it is also true that the judgment which defendant exercised as to that future resulted in a return to it upon a scale hardly comparable to the views held by the witnesses whom, long after it had realized a great profit, it called to testify as to values before the profit was realized.

"Defendant's counsel points to the fact that its witnesses gave testimony which was uncontradicted as to the value of the stock on what might be called the respective conversion dates. It is true that plaintiffs offered no rebutting testimony. In failing to do so, it may have been for the reason that upon their theory as to the remedy which the law afforded them such testimony had no relevance; or it may have been that they were without the means which were available to defendant in the tobacco industry; or it may have been for a variety of reasons.

"However that may be, there is a certain incongruity in an argument which speaks of undenied testimony given in behalf of the defendant when the experience of the defendant itself, perhaps in the exercise of rare good judgment, perhaps as a result of good fortune, or again, perhaps for a variety of reasons, is itself the effective denial of the testimony of its own witnesses, in that it was able to cash in for itself afterwards several times the value which its witnesses gave as of the dates when the fraud was committed.

"I find, therefore, that plaintiffs in all the cases are entitled to sit at what they have termed the distribution table as if at that time they were in possession of the stock of which they were deprived. In reaching this conclusion I have proceeded in the matter of damages payable upon the basis of the law as quoted from the Restatement of Restitution. Apart from this consideration, however, the Court of Appeals in its decision in the Zahn case stated the following:

"'In our opinion, if the allegations of the complaint be proved, Zahn may maintain his cause of action to recover from Transamerica the value of the stock retained by him as that shall be represented by its aliquot share of the proceeds of Axton-Fisher on dissolution. It is also our opinion that he may maintain a cause of action to recover the difference between the amount received by him for the shares already surrendered and the amount which he would have received on liquidation of Axton-Fisher if he had not surrendered his stock.' [3]

When this statement of the court of Appeals was put forward by plaintiffs as the law of the case amounting to a requirement that the view of that Court as to the damages payable to the plaintiffs in the Zahn case, should the allegations of the complaint be sustained, must be adhered to in the proceedings under the Orders of Reference, defendant offered certain objections. It claimed that the quoted words constituted no part of the decision of the case which was before the Court, being dicta and not decision, and as such that I should not give them decisional force. It contended, too, that if I should consider myself bound by the view expressed by the Court of Appeals,

"3. Zahn v. Transamerica Corp., [3 Cir.], 162 F.2d 36, 47."

the language used does not sustain the contention of plaintiffs that they are entitled to look to the amount received by defendant for the tobacco sometime after the liquidation was completed, and that the damages must be computed upon the value of the tobacco at the time of the liquidation. They say further that the words 'the amount (a holder of surrendered shares) would receive on liquidation' and the words 'the value of the stock retained' cannot be considered as a requirement that plaintiffs be treated as owners of Class A stock at the time of liquidation.

"If it should be assumed that no issue presented to the Court of Appeals called for the expressions used by it and that therefore the words employed fall into a dicta category, it seems to me that I nevertheless am not warranted in treating them as lightly as defendant suggests. I do not know if the law recognizes a distinction between words spoken obiter by a higher court in the very litigation with which a lower court is dealing, and dicta uttered in a different case.

"Whether such a distinction exists or not, no court is ever required to reject either its own dicta or that of another court. Many undoubtedly authoritative principles of law which are everywhere accepted found their origin in words spoken by the way. Be that as it may, I would consider that he would be indeed a bold Master who decided to turn his back upon the expressions of the court appellate to the one out of which his Order of Reference issued in the very litigation. Even as to what was put forward as dicta pronounced in other litigation this Court recently said:

"'It is a matter of delicacy for one court, and especially an inferior court, to attempt to limit or circumscribe the pronouncement of an appellate court when the latter has not done so * * *.' Dimet Proprietary v. Industrial Metal Protectives, D.C.Del., 109 F.Supp. 472, 476 [per Rodney, J.].

Thus, I accept, as I think I would be constrained to do, *although I myself should hold an opposite view*, [Emphasis added] the quoted language of the Court of Appeals as setting forth the damages which the Zahn plaintiffs are entitled to receive.

"What then is the meaning of that language in its application to the matter referred to me?

"It is true, as defendant suggests, that the words used in the Court of Appeals speak of the position which the plaintiffs in that case are entitled to hold 'on liquidation of Axton-Fisher.' This obviously means that plaintiffs at that time should have been entitled to receive tobacco warehouse receipts which represented their 'aliquot share'. These they did not receive for the simple reason that defendant received them in their stead. Having received them, defendant did not at once sell them as did apparently the public stockholders of Axton-Fisher under an arrangement that was made for them through the services of defendant. Had plaintiffs received their warehouse receipts upon the liquidation, as was their right under the decision, it is impossible to say whether they would have accepted the offer which defendant arranged for the other public stockholders, or whether they would, as did defendant, have held them for a better price. The Restatement in the part quoted above considers that the defrauded party is 'entitled to be put in substantially the position in which he would have been had there not been the deprivation' and it then goes on to recognize that 'this may result in granting to him an amount equal to the highest value reached by the subject-matter within a reasonable time after the tortious conduct.' What that highest value became within a reasonable time after the liquidation does not appear in this record. Nevertheless, within what I consider a reasonable time defendant itself sold its warehouse receipts at a substantially higher price than that received by the public stock-

holders.[4] In the circumstances, it would, I think, be a curious decision of an appellate court which specified that the damages payable to the defrauded party were to be measured in values at the time of the liquidation when plaintiffs were by the act of defendant deprived of the opportunity to gamble on future prices, and to permit the tortfeasor itself, who deprived them of that right, to take the gamble successfully and to retain the proceeds which resulted from it. According to the Restatement, and I think this is a case which falls within the purview of its text, the defrauded party is entitled to damages based on the highest values reached within a reasonable time after the commission of the fraud. A substantially higher price was realized by defendant itself within what I consider a reasonable period within the meaning of the text, and I know of no principle of equity or of damages which would permit it to retain the excess at the expense of the party which it defrauded. My view, therefore, is that the sales price received by defendant for the tobacco measures the damages which plaintiffs are entitled to receive."

3. The Kardon case, supra, is a decision on the measure of damages awarded under Rule X–10B–5. But there are other cases under the Securities Exchange Act which have awarded damages against "insiders". While these cases are under § 16B of the Act, which has to do with short-swing transactions by insiders, they are close enough to the transaction at bar to be helpful. Judge Clark wrote:[44]

"We must suppose that the statute was intended to be thorough-going, to squeeze all possible profits out of stock transactions, and thus to establish a standard so high as to prevent any conflict between the selfish interest of a fiduciary officer, director, or stockholder and the faithful performance of his duty. * * * The only rule whereby all possible profits can be surely recovered is that of lowest price in, highest price out—within six months—as applied by the district court."

And, Judge Learned Hand has written:[45]

"The situation falls within the doctrine which has been law since the days of the 'Chimney Sweeper's Jewel Case,' that when damages are at some unascertainable amount below an upper limit and when the uncertainty arises from the defendant's wrong, the upper limit will be taken as the proper amount."

Disgorging of profits must, under the peculiar facts of this case, be fixed within the frame of damages as I see the rule of damages.[46]

### 3. The Measure of Damages

The range of fair values for plaintiffs' shares at the period of sale, according to the Hopkinson evidence, is the market value of the A shares limited by the redemption price required discount of 10%. Thus defendant claims the fair value of the A stock should be $70.

In the case of B stock, Hopkinson found the fair value to be one of six different figures, depending on whose valuation of assets was used and amount of discounts applied for the risk factor. His fair value figures for B stock were $38.34, $36.09, $37.05, $34.87, $49.46 and $46.55. Defendant contends a fair procedure in selecting a value for the B stock is to take the average of these figures. This works out to $40. From the figure received for the B stock and from

---

"4. As will be seen infra defendant did not sell the bulk of the tobacco at the highest price which it received."

44. Smolowe v. Delendo Corp., 2 Cir., 136 F.2d 231, at page 239, certiorari denied 320 U.S. 751, 64 S.Ct. 56, 88 L.Ed. 446.

45. Gratz v. Claughton, 2 Cir., 187 F.2d 46, at page 51, certiorari denied 341 U.S. 920, 71 S.Ct. 741, 95 L.Ed. 1353.

46. In Loss, Security Regulation (Fraud by Corporate Insiders), at p. 835, the main opinion filed in the instant case establishing liability, D.C.Del., 99 F.Supp. 808, is referred to as a case "which bids fair to become a leading case under Rule X–10B–5."

the figure received for the A stock must be substracted $12 and $40, respectively, the prices paid by Transamerica to plaintiffs for their B and A shares. The result, according to defendant, is plaintiffs are entitled to $30 per A share and $28 per B share. In considering the Zahn-Friedman claims, defendant urged an amount per A share of $101.82. The computation is recognized but not accepted.

■ I decide the Zahn-Friedman plaintiffs, as well as the Speed plaintiffs, are entitled to the same measure of damages with respect to the call of A stock, whether such shares were unredeemed or redeemed in fact. For the purpose of reconstructing the liquidation, such A shares are to be considered as converted into B shares. Deciding Speed plaintiffs' B stock should not be limited to the difference between the price received and the fair value of the stock sold at the time of sale, it is necessary before the entry of a final decree for the parties to utilize a new formula for recovery of the principal amount payable on each share of A and B stock. To this must be added my determination of the allowance of interest, claimed credits, and the disposition of special defenses to particular stockholders. My decision is, in short, this: on a "what might have been" or a "reconstructed liquidation", assuming a valid call and full disclosure of facts as to values, all stock owned or formerly owned by plaintiffs shall be considered as "B" stock. All stock owned by defendant shall be also so considered. All shares of plaintiffs and those acquired by defendant shall be divided into the value of the assets at the time of liquidation. This is the rule of recovery. I assume an honest management, no defrauded stockholders, and both plaintiffs and defendant shareholders sitting at the distribution table share and share alike on liquidation of residual assets.

I proceed to an examination of the remaining questions in the case.

4. Matters of Etc.

From the record made before the Special Master, it appears defendant claimed certain credits allowable to it. These were:

(a) Storage charges for tobacco between date of distribution of warehouse receipts and sale of tobacco for $81,018.-95.

(b) Insurance premiums of $26,007.02 paid by it during this period.

(c) Personal property taxes levied on tobacco by Kentucky Tax Authorities of $20,351.43.

(d) California State Franchise Taxes paid by defendant for 1944–46, 1950 which would not have been paid but for the liquidation distributions made to it by Axton-Fisher of $334,171.03.

(e) A further claim for compensation for services for making possible profit realized on tobacco sale.

As to (a), the Special Master agreed with defendant's position. I do too for this is a direct cost of preservation of tobacco in the period between distribution and sale. As to (b) insurance premiums were likewise allowed. I agree; and the same view is expressed as to (c) involving personal property taxes. As to (d), the California State Franchise Tax item was considered in the nature of an income tax rather than a franchise tax. I agree. And (e), as to the allowance to defendant for expert services, should be disallowed. The parties did not treat these claimed credits in the presentation of the cause before me. If they had, I would dispose of them in the same fashion the Special Master did, and decide them on a similar basis.

Part II.   Interest

1. Plaintiffs claim interest upon all recoverable damages and contend such interest is to be compounded annually. For detail of the interest claims as to the A and B shares and dates from which interest should run, reference for convenience is made to the Master's Final Report.[47]

47.   Special Master's Final Report, pp. 30, 31.

As Zahn-Friedman plaintiffs put it: they should receive 6% annual interest, compounded annually, at least not later than the commencement of the present suit. Zahn-Friedman plaintiffs warn of error in the Master's Report by stating he disallowed any interest on the sum of $80.80 per unredeemed A share; and, he was in error a like sum per redeemed A share should not bear interest. Moreover, plaintiffs assert he erroneously considered offsetting interest should be charged against each redeemed Zahn-Friedman A share for the $80.80 redemption payment. Speed plaintiffs likewise claim the interest rate chargeable against defendant should be 6%. They, too, warn of error in the Master's computation of interest, and argue they should receive the legal [?] rate of 6%, compounded annually, *until payment.* Finally, they argue no interest should be charged against plaintiffs on monies they have already received from defendant.

I allude to the Master's Final Report [48] simply for its informational nature. He wrote:

"It is agreed by the parties that under the law of Kentucky the question of interest is discretionary with the Court. As I understand defendant's contention the thing which should move discretion to refuse interest is the fact that out of many volumes of testimony, in several cases, the Court has been barely able, upon indirect evidence, to arrive at the judgment of fraud. It seems to me that what in effect defendant is suggesting is that it has taken much litigation, with many obstacles to overcome, to make the fraud stand out. Unquestionably there has been much litigation which for my purposes has culminated in the judgments out of which Orders of Reference issued to me. Those judgments, are however, clear and specific, both in the decision and in the findings, as to defendant's fraud and the systematic and deliberate nature of it.

"As a result of that fraud, according to my findings, plaintiffs have been deprived of specific amounts of money as of specific dates. Plaintiffs have not been able to use the money, to which they were on those dates entitled and defendant has had the money from those dates until the present time and has presumably used it in its business. Conceding a discretion in the Court to award or not to award interest *I cannot conceive, in the circumstances, how the withholding of interest would fail to be an abuse of discretion.*"

And he also wrote: [49]

"Defendant makes the further argument upon the authority of certain cases that upon the constructive trust theory urged by plaintiffs they are not entitled to interest. This, it is said, is for the reason that plaintiffs have claimed the profit which defendant made upon the sale of warehouse receipts by holding them for a better market than that of which the public stockholders availed themselves in the sale of their receipts shortly after the liquidation. The claim is that the law does not authorize a plaintiff in such a situation to have both interest and profits and that he is compelled to elect between the two. It may well be doubted in the circumstances of this case whether defendant can be said to have made any profit upon the sale of the receipts. The record does not show what the market price of the tobacco was at the time when Axton-Fisher delivered the warehouse receipts to its stockholders in its liquidation. It shows that the public stockholders sold their receipts at a given figure and that defendant, after the sale by the public stockholders, sold its receipts at different times and varying prices which in the aggregate were higher than those received by the public stockholders. To me the transaction appears to be merely that defendant received choses in action which it subsequently sold. It did not buy receipts at one price and sell them at another. There was no profit involved. Whether the proceeds realized by it represented prices higher or lower than the market price of the tobacco at the time of liquidation

---

48. Id., pp. 32–33.

49. Id., pp. 35–37.

does not appear. It does appear, as has been shown, that the greater part of the receipts was sold at a price lower than defendant sold other receipts earlier. Whether plaintiffs, had they made the showing that the prices realized by defendants considerably later than when it acquired the receipts were less than the market at the time of the liquidation and had they in such a case claimed that they were entitled to the highest market within a reasonable time after the liquidation, need not be considered, because plaintiffs have made no such claim.

"That which plaintiffs are demanding is their aliquot share of the proceeds actually realized by defendant. And from the time of that realization they are asking for interest upon that aliquot share.

"The theory which defendant puts forward whereunder profits and interest cannot be claimed at the same time obviously rests upon facts quite different from those of the present case. Had defendant used that part of the proceeds of the sale of the tobacco, which plaintiffs should have received at the time of the liquidation, in profitable investments, and had plaintiffs been able to trace the proceeds of their share into such investments, conceivably they would have been entitled to their share of profitable proceeds, or to their aliquot share of tangible property still unsold which had at that time augmented in value. In such a case plaintiffs could not have sustained a claim both ways. They could not have demanded the profits, and interest upon the money employed to realize the profits.

"Plaintiffs, however, have made no such claim. Their claim is for interest upon their money which defendant received in the stead of the rightful owners and which defendant presumably used in its business from that time forward. This right the law accords to them.

"Rate of Interest

"The Delaware Rule of the conflict of laws extends not only to the allowance of interest if the lex loci provides for interest, but also to its allowance at the rate provided by the lex loci. Barstow v. Thatcher, 1873, 3 Houst. [Del.] 32.

"Legal interest under the law of Kentucky is six per cent. Ky.R.S. 360.010.

"It is the claim of defendant that this is not a case for the allowance of legal interest but that if interest is to be allowed at all it should be at a lesser rate.

"This matter requires little consideration. The same discretion, which the law of Kentucky lodges in the court for the allowance of interest must be accorded it as to the rate. The facts stated supra which moved me to find that interest should be allowed move me to find that it should be allowed at the legal rate of six per cent. That rate is a usual one among states, including the forum. When the Delaware rule of the conflict of laws recognizes a higher rate of the lex loci than that of the forum, as in Barstow v. Thatcher, supra, that rule would hardly be consistent with a reduction by courts of the forum of the rate provided by the locus, conceding that there the whole question of interest is discretionary."

And again he wrote: [50]

"Compound Interest

"Plaintiffs claim that not only are they entitled to interest, with which claim I have agreed, but that they are also entitled to interest upon that interest, compounded annually. The claim is urged upon the ground that defendant, being a constructive trustee for them, was in the necessity of accounting to them not less frequently than annually for the use of the funds in respect of which they were trustees. The authorities sustain such a claim as to a constructive trustee.

"Bogert states:

"'As Chancellor Walworth said: "Stating the account with periodical rests and compounding interest, is only a convenient mode adopted by the court to charge the trustee with the amount of profits supposed to have been made by

50. Id., pp. 38–41.

him in the use of the money where the actual amount of profits, which he has made, beyond simple interest, cannot be ascertained (Utica Ins. Co. v. Lynch, 11 Paige, N.Y., 520, 524). Compound interest is, however, more often allowed in cases involving fraud, wilful misconduct or other gross delinquency, than in instances of honest mistake or bad judgment. Perhaps the most common instance of the collection of compound interest from the defaulting trustee is found where he had used the trust fund in his own business and the actual profits earned by the trust fund are not claimed or are impossible of computation, or where there is a strong presumption that the trustee has used the funds in his own business, because he renders no account and in no way shows the disposition of the trust money. * * *"' (Bogert on Trusts and Trustees, Sec. 863).

"Plaintiffs refer also to Kentucky cases.

" 'In Page's Ex'r v. Holman, 1885, 82 Ky. 573, the court said:

" 'In this case it is alleged in the petition that the trustees used the trust money in their own business, and while a denial of this is interposed, yet no showing is made as to what they did with it; the burden properly rested upon them to disclose it, and they content themselves with a plea of payment which cannot be sustained. It is clear that they received the money; and it was their duty to make it profitable. As already observed they never made any settlement; and they do not show that they kept the trust fund separate from their own means; and having never accounted for the trust estate, they should be treated as having loaned it to themselves; and under such circumstances the interest should be compounded against them. It is not only equitable that this be the rule in such a state of the case, but it will tend to prevent abuse and to indemnify against negligence.' "

" 'Also in Montjoy v. Lashbrook, 1843, 41 Ky. 261, 2 B.Mon. 261, which was a suit by beneficiaries of a trust against one of the trustees, the Court said:

" 'But, as one of the trustees himself used the money he ought to have paid to Mrs. Montjoy six per cent thereon, at the end of each year, which, not having been paid, should be converted into principal as it annually became due.

" 'In this case there should, therefore, be annual rests as long as the money has been or shall be used by the trustees or either of them. And consequently, as the Circuit Court did not compound the interest, the decree, in that respect, is considered exceptionable, and must, for that cause alone, be reversed, and the cause remanded for a correction corresponding herewith.' "

"As I have found, the law of restitution as this has been expounded in the Restatement, is the applicable law here. This case does not furnish a model for the perfect application of the principles of the constructive trust, because what plaintiffs here seek by way of damages is not that which defendant received by reason of its fraud. Actually in the course which defendant's action took, as has been said before, it will receive less than it would have received had its action, which the court has characterized as fraudulent, not been taken, and had liquidation of Axton-Fisher been accomplished without fraud. As I have stated, it is the claim of defendant that, inasmuch as the fraud has now been adjudicated, it should be permitted to restore itself to the position which it would have enjoyed upon liquidation pari passu with the plaintiffs and others similarly situated with them if I should reject its ratification theory of damages. This, I have found, they are not entitled to do, and that they must lie in the bed they made, while those whom the defrauded are entitled to be restored to the liquidation position which they would have enjoyed had the fraud not been committed, and, in the usual situation of this case, to receive more than they would have received had there been no fraud.

"According to finding 4 of the case [7] defendant was and is a holding company. In the usual conception a holding company is one which invests its funds in the shares of other companies for profit. The allegation of Paragraph VIII of the Friedman complaint which is admitted by the answer is that defendant is 'an investment and holding company, with its holdings concentrated primarily in bank securities but also having large real estate holdings and stockholdings in chemical and other concerns.' We must, consequently, assume that the moneys of which plaintiffs were deprived by defendants in the amounts which I have attributed to them, and for which defendant is accountable to plaintiffs as of particular dates in varying amounts, have been used in the holding company or investment operations of defendant. There can, accordingly, be no difference in principle between the obligation of defendant and that of a constructive trustee as stated by Bogert upon the authority of Chancellor Walworth. The principle stated by him applies here; that is to say, when the defaulting trustee used the trust fund in his own business, and earned actual profits which were not claimed, or were impossible of computation, or where there was a strong presumption that the trustee had used the funds in his own business, and because he rendered no account and in no way showed the disposition of the trust money, compound interest was allowable. Putting it somewhat differently, as the Court did in Page's Ex'r v. Holman, supra, since the burden properly rested upon the trustee to disclose what he had done with the money, he must be treated as having used it for himself, and never having accounted for its use, interest should be compounded against him.

"As I have attempted to show, the remedy of restitution, which the restaters of the law have in effect worked out upon principles which appertain to several branches of the law, has perhaps been more extensively borrowed, as their article in the Law Quarterly Review shows from the field of constructive trusts than from any other single branch.

"I find that the claim for interest compounded annually should be allowed."

2. My function is not here either to adopt or reject the Special Master's findings and conclusions. Again, I do not agree with his treatment of the interest problem. He was wrong there. The starting point is plaintiffs are not entitled to interest as a matter of right.

▮▮▮ Both Kentucky law, which governs the Zahn-Friedman case and the common law count in the Speed case,[51] and federal law, which governs the three counts involving violations of SEC regulations in the Speed case,[52] represent the rule interest on unliquidated claims is a matter within the discretion of the Court.[53] The same rule applies to cases based on fraud.[54] In exercising discretion on award of interest, courts have "drawn upon those flexible considerations of equity which are established sources for judicial law making." [55]

▮▮▮ 3. While defendant argues the circumstances of this case are such there should be a refusal to award any interest, I do not pause to discuss de-

---

"7. [D.C.Del.], 99 F.Supp. 833."

51. Geller v. Transamerica Corp., D.C.Del., 53 F.Supp. 625, 629, affirmed, 3 Cir., 151 F.2d 534; Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, 40, 172 A.L.R. 495.

52. Clark v. E. J. Lavino & Co., 3 Cir., 175 F.2d 897, 900; Milwaukee Towne Corp. v. Loew's, Inc., 7 Cir., 200 F.2d 17.

53. See, e. g., Kendall v. Mussman, Ky., 247 S.W.2d 502; Fidelity & Cas. Co. of New York v. Downey, 284 Ky. 72, 143 S.W.2d 869; Congoleum-Nairn, Inc., v. M. Livingston & Co., 257 Ky. 573, 78 S.W.2d 781; Royal Indemnity Co. v. United States, 313 U.S. 289, 296, 61 S.Ct. 999, 85 L.Ed. 1361; Abell v. Anderson, 6 Cir., 148 F.2d 372.

54. Ligon v. Minton, Ky., 125 S.W. 304; Jackson's Ex'rs v. Holliday's Adm'rs, 19 Ky. 363.

55. Board of County Comm'rs of Jackson County in State of Kansas v. United States, 308 U.S. 343, 350, 352, 60 S.Ct. 285, 84 L.Ed. 313. (Per Mr. Justice Frankfurter).

fendant's cited authorities for I think them inapplicable. At the same time, I reject plaintiffs' claim for a compound interest award, for award of interest is not a punitive device.[56] Interest represents damages for delay in payment and compensation for use of plaintiffs' money. In short, it is moratory interest and not contract or punitive interest.[57] Simple interest is regarded as adequately compensatory, even in cases of fraud.[58] It has been suggested (but I do not agree in every case) there is a general public policy against the award of compound interest.[59]

4. My reason for disallowance of compound interest is this: Aside from invective articulated by plaintiffs against defendant's evil-doing, both legal and factual issues throughout this long litigation were nice. The scales of justice were delicately adjusted. After trial and a microscopic examination of the record, I was unable to find direct evidence supporting the critical fact of intent to liquidate.[60] But, I did find intent, on the basis of rational inferences and probabilities, after an application of all known analytical fact-finding techniques utilized by a court of equity that a majority shareholder intended to capture a profit which in the normal flux of corporate function would have been mutually shared by minority shareholders.

This litigation broke new legal ground in defining relations between majority members and other security holders of a corporation *inter sese*.[61] In short, I conclude this is not a case to justify imposition of punitive damages by compounding interest.

5. The rate of interest should not exceed a 4% award of prejudgment interest.[62] During the past 20 years a cheap-money period shows a downward trend of prejudgment interest rates on all federal and state claims. Compensatory character of the award has led to dissatisfaction with the habitual judicial application of the legal rate of 6%. Aside from contract interest setting the rate, or action involving a statutory rate, interest is not allowed, as such, but is simply an incident of the measure of the amount of damage caused by delay in payment, which obviously depends on the particular facts of each case.

6. References are made to money markets to determine rate of interest. As stated by one federal court (per Judge Paul): "I think it plain that to allow interest * * * at six per cent * * * would more than compensate the plaintiffs. It is a matter of common knowledge that for some years past, including this entire period, money has been available at substantially less than six per cent even to the ordinary borrower at banks; and similarly investments promising reasonable safety cannot be found at such a rate."[63] After World War II, the Court of Claims

56. United States v. United Drill & Tool Corp., 87 U.S.App.D.C. 236, 183 F.2d 998, 1001.

57. Rodgers v. United States, 332 U.S. 371, 68 S.Ct. 5, 92 L.Ed. 3; Billings v. United States, 232 U.S. 261, 285, 34 S.Ct. 421, 58 L.Ed. 596.

58. Marcus v. Otis, 2 Cir., 168 F.2d 649; Salyer v. Blessing, 151 Ky. 459, 152 S.W. 275, 278; Ligon v. Minton, Ky., 125 S.W. 304, 305–306. Cf.: Dale v. Thomas H. Temple Co., 186 Tenn. 69, 208 S.W.2d 344; Fidelity-Philadelphia Trust Co. v. Simpson, 293 Pa. 577, 143 A. 202; McCarthy v. Brockton Nat. Bank, 314 Mass. 318, 50 N.E.2d 196.

59. McCormack, Damages, § 53; 47 C.J.S.,

Interest, § 3, p. 15; Developments in the Law: Damages, 61 Harv.L.Rev. 113, 138.

60. D.C.Del., 99 F.Supp. at page 812.

61. See, e. g., 61 Harv.L.Rev. 359; 36 Calif. L.Rev. 325; 46 Mich.L.Rev. 1061; 50 Mich.L.Rev. 743; 96 U.Pa.L.Rev. 276.

62. Equitable considerations must weigh award of prejudgment interest. Cf. Superior Tube Co. v. Delaware Aircraft, D.C.Del., 60 F.Supp. 573; E. M. Fleischmann Lumber Co. v. Resources Corp., D.C.Del., 114 F.Supp. 843, for discussion of interest under Delaware law.

63. City of Danville v. Chesapeake & O. Ry. Co., D.C.W.D.Va., 34 F.Supp. 620, 638–39.

began allowing 4% interest.[64] In Arkansas Valley Ry. v. United States, 107 Ct.Cl. 240, 68 F.Supp. 727, at page 730, the Court of Claims formalized its new approach and elaborated on the reasons underlying it (per Chief Justice Whaley);

"To make recovery sufficient to comply with the concept of just compensation the plaintiff claims an interest rate of six percent per annum, as the legal rate of interest in the State of Kansas. But there is no statute or ruling fixing any particular rate to be allowed. Since the determination of just compensation under the Fifth Amendment is exclusively a judicial function, it is for the Court to fix upon the rate that it will allow. For some time this Court has, in view of low prevailing rates of interest, limited this rate to four percent."

7: Another federal law area in which allowance of interest less than 6% has been practiced is in suits to recover excess profits where the figure of 4% interest has been mentioned.[65] A number of Courts of Appeals have sanctioned awards of interest less than 6%.[66] District Courts have also approved this development.[67] As early as 1914, state courts were departing from the 6% rate on prejudgment interest because it did not reflect the cost of money and overcompensated plaintiffs for the use of the amount withheld.[68] The same approach has been followed by federal courts in diversity cases.[69] The law of Kentucky is in accord.[70]

■■■ 8. I have decided to make an interest award, but the award must be made based on the facts of the present case and "warrant the exercise of its

---

64. Schaffer v. United States, 104 Ct.Cl. 229, 60 F.Supp. 760; Walker v. United States, 105 Ct.Cl. 533, 64 F.Supp. 135.

65. United States v. United Drill & Tool Corp., D.C.D.C., 81 F.Supp. 171, 172, affirmed 87 U.S.App.D.C. 236, 183 F.2d 998.

66. United States v. Best, 1 Cir., 212 F.2d 743; Ring Construction Corp. v. United States, 8 Cir., 209 F.2d 668, 674; United States v. Edward Valves, Inc., 7 Cir., 207 F.2d 329; United States v. Abrams, 6 Cir., 197 F.2d 803, 806; United States v. Bonnell, 9 Cir., 180 F.2d 145.

67. United States v. Hopkins, D.C.N.D. Ohio, 95 F.Supp. 14, 16 ("3% interest would be better suited to modern times"); United States v. American Metal Co., D.C.N.J., 86 F.Supp. 533, 534–535 (2½% awarded because "defendants did not, and could not, enjoy a six percent return * * *"); United States v. Clark, D.C.Or., 72 F.Supp. 393, 394 (2½% awarded because defendants "should not be charged with higher interest than they have been able to earn on the money").

For still another example of a federal claim upon which 4% interest was allowed in conformity with the rates prevailing in "the money market in general", see R.F.C. v. Service Pipe Line Co., 10 Cir., 206 F.2d 814, 818.

68. John Agnew Co. v. Board of Education, 83 N.J.Eq. 49, 89 A. 1046, 1054–1055;

Art Club of Philadelphia v. Heyman & Goodman, 325 Pa. 587, 190 A. 922, 925.

69. Sawyer v. E. F. Drew & Co., D.C.N.J., 113 F.Supp. 527, 528, affirmed 3 Cir., 209 F.2d 566. And see, Chesapeake & O. Ry. v. Elk Refining Co., 4 Cir., 186 F.2d 30.

In Austrian v. Williams, D.C.S.D.N.Y., 103 F.Supp. 64, the Court said:

"No attempt here is made to reach a precise amount of interest. In the Court's view, 4% more realistically reflects the overall rate of interest on private debts or the yield on investments during the period in question and is more consonant with an equitable and fair result." 103 F.Supp. at page 118.

* * *

"In making the disposition indicated herein, the Court does so, not on the basis of any equity existing in favor of the defendants, in the case proper, but solely on the basis of economic factors during the period in question which warrant the exercise of its discretionary power in order to reach a fair and just result." Id., 103 F.Supp. at page 119.

70. In Western Casualty & Surety Co. v. Meyer, 301 Ky. 487, 192 S.W.2d 388, 393, 164 A.L.R. 769, the Court said: "In the enforcement of the equitable remedy, a court may or may not award interest according to the conception of justice and fairness" and sustained an award of prejudgment interest at the rate of 3%. See also, Kaufman v. Kaufman's Adm'r, 292 Ky. 351, 166 S.W.2d 860, 144 A.L.R. 866.

[the court's] discretionary power". I shall set a rate of interest not exceeding 4% "in order to reach a fair and just result".

■ I fixed the rate of interest to be allowed, after considering the delays in this litigation, and whether they were attributable to plaintiffs or defendant, or both. The present cases were litigated for over 10 years. Interest is claimed throughout this period. Defendant is entitled to an adjustment in interest (4%) for delays not attributable to it.[71] It is unnecessary to catalog as against each party the delays in this litigation. Zahn-Friedman plaintiffs filed their complaint in 1944, but by amendments it took 2 years before their complaint was procedurally perfected. Defendant moved for trial in 1947, but plaintiffs resisted, and trial was delayed for 4 years, until April 1948.

9. Delays in prosecuting a claim have been held to warrant disallowance of all interest.[72] Plaintiffs should not recover interest for periods of delay for which they are fairly chargeable.[73] And it has been held recovery of interest will be disallowed where plaintiff's delay is without fault, but where there was, in fact, delay and inaction by plaintiff.[74] In the Smoky City case, our Court of Appeals approved the practice of making an appropriate reduction in interest rate to account for delays in litigation. This method was followed by Judge Rodney in E. M. Fleischmann Lumber Corp. v. Resources Corp. Int'l, D.C.Del., 114 F.Supp. 843, affirmed, 3 Cir., 211 F.2d 204. In that case he reduced the rate of interest during the period of litigation by one-half, allowing only 3% instead of 6%.

10. Award of simple interest compensates plaintiffs for the value of the use of the principal withheld from them. There is existence of substantial delays. It is impossible to make mathematical apportionment as of the constructive factor against plaintiffs or defendant. I conclude an interest award of 4% should be cut 50% and should not exceed more than simple interest at 2%. The earliest date from which interest can run in favor of Zahn-Friedman plaintiffs is May 31, 1944, the date of the dissolution resolution. As to Speed plaintiffs, interest can run from no earlier date than November 12, 1942, when most of the Speed plaintiffs, in fact, sold their shares. As to the interest item, it will run and continue to run until plaintiffs are paid and the final decree entered here is subject to payment. Therefore, it is impossible to make a mathematical computation as to the exact interest award until this occurs.

### Part III. Defenses Concerning Particular Plaintiffs

■ 1. *Personal Defense: Plaintiff Benson.* On May 10, 1943, Mr. Benson purchased 100 shares of Class A for $8,095.16. He was a plaintiff in the Zahn-Friedman action, which was commenced on August 31, 1944. On July 31, 1946, Mr. Benson sold his stock for more than he paid for it. I have held Transamerica is accountable to "all the Class A stockholders who still own their shares".[75] A member of a class on whose behalf suit is brought may disqualify himself from participation by removing himself from the class during litigation.[76] Benson's sale of his stock was not induced by any fraud of defendant. He

---

71. E. g., Redfield v. Ystalyfera Iron Co., 110 U.S. 174, 176, 3 S.Ct. 570, 28 L.Ed. 109; The Smoky City, 3 Cir., 88 F.2d 959.

72. The James McWilliams, 2 Cir., 240 F. 951, 952.

73. The Ansaldo San Giorgio I, D.C.S.D. N.Y., 3 F.Supp. 579, reversed on other grounds, 2 Cir., 73 F.2d 40, affirmed 294 U.S. 494, 55 S.Ct. 483, 79 L.Ed. 1016; The Arpillao, 2 Cir., 270 F. 426; Bushey v. Huron Stevedoring Co., 2 Cir., 56 F.2d 604.

74. Rasmusson v. National Popsicle Corp., 9 Cir., 105 F.2d 759; cf. Hoelzel v. Gavalas, 52 A.2d 54, 55-56, 25 N.J.Misc. 191; General American Life Ins. v. Anderson, 6 Cir., 156 F.2d 615.

75. D.C.Del., 99 F.Supp. at page 849; see, also, Zahn v. Transamerica Corp., 3 Cir., 162 F.2d 36, 47-48.

76. National Hairdressers' and Cosmetologists' Ass'n, Inc., v. Philad Co., D.C.Del., 3 F.R.D. 199.

preferred to pocket a more immediate cash return rather than await the results of a long litigation. He took himself out of the class which was litigating. His claim must be dismissed.

2. *Failure of Proof:* The Order of Reference to the Special Master [77] provided plaintiff Percival J. Steindler, individually, had failed to prove he surrendered Class A stock for redemption or held unsurrendered certificates for such stock. He was given leave to introduce the necessary evidence. He has produced none of the requisite evidence. The action as to him will be dismissed.

3. *Lack of Jurisdiction:* Plaintiffs *Gloria Bean, Rose Cohen, Max Friedman, Victor Lomoff, Nathan Shapiro, Rebecca Shenker.* The Zahn-Friedman suit is a spurious class action.[78] In such an action, diversity must be present and *each* plaintiff must have a claim in excess of the jurisdictional amount.[79]

The Zahn-Friedman complaint avers generally the sums to which each plaintiff is entitled exceed the $3,000 prerequisite. Jurisdictional averments are not controlling where a complaint also advances specific damage claims.[80] In the complaint here, there are specific claims for damages. In the light of these, the general jurisdictional averments of paragraph 3 must be disregarded as a mere conclusion. Plaintiffs Gloria Bean and Rose Cohen hold 10 shares each of A stock. Max Friedman, Victor Lomoff, Nathan Shapiro and Rebecca Shenker hold only 20 shares. On the highest award that could be made to these plaintiffs, it follows there is no jurisdiction of the causes of action asserted by them. The complaint as to them must be dismissed.

The Special Master discussed the individual cases of approximately eight other persons, partnerships or associations whose right to recover was questioned by defendant. I shall not pause to discuss any specific claims or particular defenses against these security holders. They were discussed in the Master's Report. Neither briefs nor oral argument pressed these particular issues. If disposition of these claims for recovery is still relevant, disposition will be made by appropriate provisions in the final order or decree.

4. This protracted litigation was bottomed at the outset on equitable relief. I have weighed the conflicting interests of plaintiffs and defendant in the intricate contest of this case. I recognize the realities of corporate law and the usages and practices of the financial community. I have been sensitive to the injury suffered by the minority shareholders. I have held in Zahn-Friedman the Class A stockholders should be treated as converted B shareholders and the A shareholders in the Speed case should be likewise so regarded; and the B stock which was sold to defendant or which is still publicly held should share equally with both A and B stock once held by defendant Transamerica. All plaintiffs and defendant should participate in the residual assets of Axton-Fisher on liquidation and on an equal basis, except plaintiffs are to enjoy an award of interest, as specified, and be subject to such credits as have been noted. In short, defendant Transamerica as *dominant* stockholder of Axton-Fisher should not receive one penny of profit over that which plaintiffs should receive on a reconstructed liquidation basis.

Counsel will agree on a form of final decree and judgment for award of damages, in conformity with the opinions of this court.

77. Order dated October 18, 1951, paragraph 9.

78. Zahn v. Transamerica Corp., ibid., (per Chief Judge Biggs).

79. Independence Shares Corp. v. Deckert, 3 Cir., 108 F.2d 51; Hackner v. Guaranty Trust Co. of New York, 2 Cir., 117 F.2d 95, 97; cf. Giesecke v. Denver Tramway Corp., D.C.Del., 81 F.Supp. 957, 961.

80. Lion Bonding & Surety Co. v. Karatz, 262 U.S. 77, 86, 43 S.Ct. 480, 67 L.Ed. 871; KVOS, Inc., v. Associated Press, 299 U.S. 269, 277, 57 S.Ct. 197, 81 L.Ed. 183; Gibbs v. Buck, 307 U.S. 66, 72, 59 S.Ct. 725, 83 L.Ed. 1111; Odell v. Humble Oil & Refining Co., 10 Cir., 201 F.2d 123, 128.

On Form of Final Decree

The parties were heard at length on the form of the final decrees. Each submitted a decree. While substantially similar, there were several differences of major import. After argument I decided what form the decree should take (orally from the bench); but the parties did not discuss the question of post-judgment interest. Later memoranda briefs were filed. These have been read and considered and oral argument is not desired.

I agree with the plaintiffs' view on post-judgment interest, especially under the particular facts of this case. If the judicial function here calls for the exercise of the court's discretion then every equity supports the views of the plaintiffs on post-judgment interest. From the present on, any further delays in this long litigation will be at the prompting of defendant. Accordingly, I think plaintiffs should enjoy not only the current rate of 4% on post-judgment interest but, on the contrary, plaintiffs now that they have their judgment after long years of litigious struggle should enjoy the full legal rate of 6%, and the final decrees shall so provide.